E-FILED; Montgomery Circuit Court
Docket: 2/4/2022 1:27 PM; Submission: 2/4/2022 1:27 PM

# EXHIBIT A

# BILL OF SALE

THIS BILL OF SALE is made and entered into effective the **1/10/2011**, by and between **DAVID M PRICE**, doing business at **908 KINGSBRIDGE TERRACE, MT AIRY, MARYLAND 21771** ("SELLER") and **WALTER R DAVIS** residing at **5311 SOVEREIGN PLACE, FREDERICK, MARYLAND 21703** ("PURCHASER").

In consideration of the sum of **ONE HUNDRED THIRTY TWP THOUSAND EIGHT HUNDRED NINETY SIX DOLLARS AND 00/100 ($132,896.00)** paid to him by PURCHASER, SELLER hereby sells, transfers, conveys, assigns and delivers to PURCHASER, and PURCHASER hereby purchases, accepts, assumes and receives from SELLER, all of SELLER'S right, title and interest in and to the following assets, properties, rights and interests (the "ASSETS"):

    (a) the Distribution Rights to sell and distribute Products manufactured and/or distributed by BIMBO FOODS BAKERIES DISTRIBUTION INC., (formally George Weston Bakeries Distribution Inc.) ("BFBD") to Outlets in the geographic territory described on Schedule A attached hereto, which Products, Outlets and Distribution Rights are defined by, subject to and further evidenced by a written Distributor's Agreement previously executed between BFBD and SELLER;

    (b) computer customer data and customer lists;

**TO HAVE AND TO HOLD** the same, with the appurtenances thereof, unto the PURCHASER, his successors and assigns, forever, to his own proper use and behalf.

SELLER hereby represents and warrants to PURCHASER for himself and his successors that SELLER is the sole owner of and has good and marketable title to all of the Assets and conveys them to PURCHASER free and clear of any mortgage, lien, claim, right, security interest, encumbrance, covenant, easement or restriction of any kind or nature.

SELLER hereby covenants and agrees with PURCHASER that he will not compete with PURCHASER in the sale of any bakery food product similar to or competitive with products produced or distributed by BFBD in any part of the geographic territory hereby transferred for a period of two (2) years from the date hereof.

EXCEPT AS EXPRESSLY SET FORTH HEREIN, THE ASSETS ARE CONVEYED "AS IS" AND "WHERE IS" WITH ALL FAULTS, WITHOUT REPRESENTATION AND WARRANTY OF ANY KIND WHATSOEVER, INCLUDING, WITHOUT LIMITATION, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, CONDITION, QUANTITY OR OTHERWISE, AND ALL SUCH WARRANTIES ARE HEREBY DISCLAIMED.

IN WITNESS WHEREOF, SELLER and PURCHASER have caused this Bill of Sale to be duly and properly executed as of the day and year first above written.


DAVID M PRICE
SELLER

WALTER R DAVIS
PURCHASER

**E-FILED; Montgomery Circuit Court**
**Docket: 2/4/2022 1:27 PM; Submission: 2/4/2022 1:27 PM**

# EXHIBIT B

# BIMBO FOODS BAKERIES DISTRIBUTION INC.

# BILL OF SALE

**T**HIS BILL OF SALE is made and entered in **January 10, 2011** by and between **BIMBO FOODS BAKERIES DISTRIBUTION INC.** ("BFBD") doing business at 255 BUSINESS CENTER DRIVE, HORSHAM, PENNSYLVANIA 19044 ("SELLER") and **WALTER R DAVIS** residing at **5311 SOVEREIGN PLACE, FREDERICK, MARYLAND 21703 (PURCHASER")**.

In consideration of the sum of ($15,056.00) **FIFTEEN THOUSAND FIFTY SIX DOLLARS AND 00/100**, the net proceeds of which have been paid to it or on its behalf by PURCHASER, BFBD hereby sells, transfers, conveys, assigns and delivers to PURCHASER, and PURCHASER hereby purchases, accepts, assumes and receives from BFBD, all of BFBD'S right, title and interest in and to the following assets, properties, rights and interests (the "ASSETS"):

(a) the Distribution Rights to sell and distribute Products manufactured and/or distributed by **BIMBO FOODS BAKERIES DISTRIBUTION INC.**, ("BFBD") or its subsidiaries, affiliates or divisions to Outlets in the geographic territory described on **Schedule A** attached hereto, which Products, Outlets and Distribution Rights are defined by, subject to and further evidenced by a written Distributor's Agreement previously executed between BFBD and SELLER;

(b) computer customer data and customer lists;

**TO HAVE AND TO HOLD** the same, with the appurtenances thereof, unto the PURCHASER, his successors and assigns, forever, to his own proper use and behalf.

BFBD hereby represents and warrants to PURCHASER for himself and his successors that BFBD is the sole owner of and has good and marketable title to all of the Assets and conveys them to PURCHASER free and clear of any mortgage, lien, claim, right, security interest, encumbrance, covenant, easement or restriction of any kind or nature.

EXCEPT AS EXPRESSLY SET FORTH HEREIN, THE ASSETS ARE CONVEYED "AS IS" AND "WHERE IS" WITH ALL FAULTS, WITHOUT REPRESENTATION AND WARRANTY OF ANY KIND WHATSOEVER, INCLUDING, WITHOUT LIMITATION, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, CONDITION, QUANTITY OR OTHERWISE, AND ALL SUCH WARRANTIES ARE HEREBY DISCLAIMED.

IN WITNESS WHEREOF, BFBD and PURCHASER have caused this Bill of Sale to be duly and properly executed as of the day and year first above written.

**BIMBO FOODS BAKERIES DISTRIBUTION INC.**
**SELLER**

**WALTER R DAVIS**
**PURCHASER**

DATE: _____ 2010

E-FILED; Montgomery Circuit Court
Docket: 2/4/2022 1:27 PM; Submission: 2/4/2022 1:27 PM

# EXHIBIT C

# BIMBO FOODS BAKERIES DISTRIBUTION INC.

## DISTRIBUTION AGREEMENT

**T**HIS AGREEMENT made effective January 10, 2011 by and between BIMBO FOODS BAKERIES DISTRIBUTION INC., a business corporation with its principal office at 255 Business Center Drive Horsham, Pennsylvania 19044, (herein referred to as "BFBD") and WALTER R DAVIS, residing at **5311 SOVEREIGN PLACE, FREDERICK, MARYLAND 21703** (herein referred to as "DISTRIBUTOR").

### W I T N E S S E T H :

**WHEREAS**, BFBD has heretofore developed and or acquired the exclusive distribution rights, to distribute and sell various fresh baked products throughout much of the United States; and

**WHEREAS**, DISTRIBUTOR has the ability and experience necessary to sell and distribute Products successfully within a specific geographic area; and

**WHEREAS**, DISTRIBUTOR has purchased from DISTRIBUTOR'S predecessor distributor or BFBD the Distribution Rights in the Sales Area hereinafter described; and

**WHEREAS**, the parties desire to enter into a written agreement describing and setting forth the terms and conditions under which they will do business with each other;

**NOW THEREFORE**, in consideration of the premises, covenants and conditions set forth herein, and for other good and valuable consideration given and received, the parties mutually agree as follows:

# ARTICLE 1
# DEFINITIONS

§1.1 **SALES AREA:** Shall mean that geographic area within which DISTRIBUTOR owns the Distribution Rights, as more specifically described in Schedule A attached hereto and made a part hereof.

§1.2 **OUTLETS:** Shall mean those purchasers of products as specifically defined and described in Schedule B attached hereto and made a part hereof.

§1.3 **PRODUCTS:** Shall mean all those bakery products as specifically defined and described in Schedule B attached hereto and made a part hereof.

§1.4 **DISTRIBUTION RIGHTS:** Shall mean the sole right to sell and distribute Products to Outlets in the Sales Area, which right has been purchased by DISTRIBUTOR from BFBD or from DISTRIBUTOR'S predecessor, as evidenced by a Bill of Sale executed heretofore.

§1.5 **CHAIN:** Shall mean a person or business entity that operates more than one Outlet and makes decisions regarding the purchase of Products for its Outlets at a central office.

§1.6 **FORCE MAJEURE:** Shall mean an Act of God, war, fire, explosion, riot, looting, civil commotion, failure of machinery or plant, restrictions by a Government or any competent authority, strikes or lock-outs at either party's premises or in any related trade or business or any other similar circumstances of whatsoever kind beyond the control of the party affected which affects either party's performance of its obligations under this Agreement.

# ARTICLE 2
# RELATIONSHIP

**§2.1** **EXTENT AND DURATION:** BFBD hereby recognizes DISTRIBUTOR'S ownership of the Distribution Rights, which ownership will continue until the Distribution Rights are sold or transferred as provided herein.

**§2.2** **TERMINATION OF THIS AGREEMENT:** The parties agree that the Distribution Rights can be exercised only pursuant to the terms of this Agreement and that any termination of this Agreement requires DISTRIBUTOR or BFBD, for the account of DISTRIBUTOR, to sell such Distribution Rights as provided herein.

**§2.3** **INDEPENDENT CONTRACTORS:** The parties intend to create an independent contractor relationship and it is of the essence of this Agreement that DISTRIBUTOR is an independent contractor for all purposes and DISTRIBUTOR shall only identify himself as such in all third party dealings.  Any contrary final determination by any board, tribunal or court of competent jurisdiction shall require the amendment of this Agreement in any way necessary to establish an independent contractor relationship.  As an independent contractor, DISTRIBUTOR has the right to operate the business as DISTRIBUTOR chooses, and shall bear all risks and costs of operating such business. DISTRIBUTOR has no authority to retain any person on behalf of BFBD.  It is expressly understood that DISTRIBUTOR has no claim, or right under any circumstances, to any benefits or other compensation currently paid by BFBD to employees, or hereafter declared by BFBD for the benefit of employees.  No fiduciary relationship exists between the parties.

**§2.4** **NOTICE:** DISTRIBUTOR agrees to have painted in a conspicuous manner on any delivery vehicle owned or leased by DISTRIBUTOR to carry out the terms hereof: "Owned and operated by WALTER R DAVIS, an Independent Contractor."

## ARTICLE 3
## SALE OF PRODUCTS

**§3.1**  **TITLE:** All Products will be sold to DISTRIBUTOR absolutely, and title to and risk of loss of the Products shall pass to DISTRIBUTOR upon delivery of the Products in accordance with §3.2 below.

**§3.2**  **DELIVERY:** Except as otherwise provided herein, BFBD agrees to sell and deliver to DISTRIBUTOR or to arrange for such sale and delivery by affiliates, and DISTRIBUTOR agrees to buy and accept, at such location as BFBD may from time to time reasonably designate or approve, sufficient quantities of the Products to adequately and properly supply the Outlets in the Sales Area. BFBD agrees to use commercially reasonable efforts to fill DISTRIBUTOR'S orders in a reasonable and timely fashion. In case of strike, shortage of materials, equipment breakdown or other cause, BFBD reserves the right to fill orders on such reasonable basis as circumstances then permit. BFBD and DISTRIBUTOR recognize that cuts and pluses and, on rare occasions, cancellations of deliveries, in whole or in part, are an unavoidable aspect of fresh baked goods production. In the event of such pluses, DISTRIBUTOR agrees to use DISTRIBUTOR'S reasonable efforts to effect the sale of the additional product. BFBD further agrees to accept and give full credit for any damaged or off code Product which is not damaged or off code by reason of DISTRIBUTOR'S negligence, and which has been promptly returned in accordance with BFBD'S then current stale and damage return policy. BFBD reserves the right to make reasonable amendments to such stale and damage return policy from time to time.

**§3.3**  **TERMS:** Products will be sold to DISTRIBUTOR on terms and prices established by BFBD from time to time.

**§3.4**  **SETTLEMENT OF ACCOUNT:** On or before Friday of each week, DISTRIBUTOR will remit to BFBD or its affiliates the purchase price of all Products delivered to

DISTRIBUTOR during the preceding week, less credit for any off code or damaged Products which have been returned in accordance with §3.2 above.

§3.5 **PURCHASE OF RECEIVABLES:** In cases where the DISTRIBUTOR sells and distributes Products to Chains or Outlets, which have been approved by BFBD for credit, BFBD or its affiliates shall, at the request and for the convenience of DISTRIBUTOR, purchase properly filled out and executed charge slips and/or invoices from the DISTRIBUTOR at their face value, and credit DISTRIBUTOR'S account therefore. DISTRIBUTOR shall promptly remit all such necessary documentation to BFBD and sign such assignments and agreements as may be necessary to transfer to BFBD all receivables and accounts. If a Chain elects to pay for purchases of product on a scan, rather than delivery basis, BFBD or its affiliates shall purchase the receivable from DISTRIBUTOR at the full face value of the scan report.

§3.6 **PROMOTION PARTICIPATION PROGRAM:** In cases where DISTRIBUTOR wishes to sell Products to Outlets at prices which are less than those reflected on BFBD's then current Suggested Price List, and DISTRIBUTOR wishes to have BFBD participate and BFBD or its affiliates agree to participate in such promotion or discount price, BFBD will contribute pursuant to BFBD's Promotion Participation Policy as amended from time to time.

§3.7 **SECURITY INTEREST:** To secure the payment of any indebtedness or liability of DISTRIBUTOR to BFBD or its affiliates now or hereafter arising pursuant to this Agreement or otherwise, DISTRIBUTOR hereby grants and conveys to BFBD a continuing and general security interest in the Distribution Rights, all other assets used in connection with the operation of the Distribution Rights, all rights hereunder and all Products and receivables of the DISTRIBUTOR, and grants to BFBD the rights of a secured party. DISTRIBUTOR agrees to execute the BFBD Security Agreement and

financing statement(s) to evidence such security interest.  Any default under the BFBD Security Agreement by DISTRIBUTOR shall be a default under this Agreement.

§3.8  **DEFAULT:** Nothing herein shall be deemed to require BFBD to fill an order of DISTRIBUTOR during any time when DISTRIBUTOR is in default of any payment or other obligation to BFBD or its affiliates.

## ARTICLE 4
## DISTRIBUTOR'S OBLIGATIONS

§4.1  **RESULTS:**  In order to maximize its purchases from BFBD, DISTRIBUTOR agrees to develop and maximize sales of Products to Outlets within the Sales Area by maintaining an adequate and fresh supply of Products in all Outlets; rotating Products to promote their sale before they become stale or off code; promptly removing all stale or off code Products; cooperating with BFBD or its affiliates in its marketing programs, maintaining a computer assisted record-keeping system compatible with the system maintained by BFBD now or in the future; and providing service on a basis consistent with good industry practice to all Outlets requesting service in the Sales Area.  DISTRIBUTOR is not required to service any Outlet that has proven consistently to be unprofitable, provided that where a Chain requires that such an Outlet be served as a condition for serving its other outlets, the profitability of any Outlet which is part of that Chain shall be judged on the basis of the profitability of the Chain as a whole.  Nothing herein shall be deemed to prohibit DISTRIBUTOR'S right to carry and distribute merchandise for other companies or otherwise engage in any other business activity unless and except to the extent that such other merchandise is competitive with or could contaminate the Products or such other business activity is inconsistent or interferes with the obligations of the DISTRIBUTOR hereunder.

**§4.2** **COMPLIANCE:**  DISTRIBUTOR shall operate the business in compliance with all federal, state and local laws, rules and regulations.

**§4.3** **PERSONAL SERVICES NOT REQUIRED:** Nothing herein shall be deemed to contemplate or require that DISTRIBUTOR perform any of the services called for by this Agreement personally, and DISTRIBUTOR shall be free to engage such persons as DISTRIBUTOR deems appropriate to assist in discharging DISTRIBUTOR'S responsibilities hereunder. DISTRIBUTOR shall have the exclusive right to select, fix the compensation of, discharge and otherwise to manage, supervise and control all persons engaged by DISTRIBUTOR and shall, with respect to all such persons, perform all obligations and discharge all liabilities imposed upon DISTRIBUTOR under all government laws, rules or regulations ("Laws"), whether such Laws relate to labor, employment standards, worker's compensation, unemployment insurance, pay equity or any other governmental requirement; file all required tax information, reports and pay and/or withhold all applicable payroll-related taxes with respect to any employees of DISTRIBUTOR.  DISTRIBUTOR in all events shall be and remain responsible for insuring that all persons engaged by DISTRIBUTOR comply fully with all the terms and conditions of this Agreement.  Any breach of this Agreement by any person engaged by DISTRIBUTOR shall be deemed to be a breach by DISTRIBUTOR.

**§4.4** **NON-COMPLIANCE:** Failure to carry out the terms, conditions and obligations listed in this Article or elsewhere in this Agreement shall be considered a breach of this Agreement and shall entitle BFBD to terminate this Agreement as more specifically set forth in Article 8 hereof, except that DISTRIBUTOR shall not be responsible for failures caused by Force Majeure, provided however, that an event of Force Majeure shall not excuse DISTRIBUTOR from any obligations to pay for Products pursuant to Article 3.

## ARTICLE 5
## BFBD' OBLIGATIONS

**§5.1  DELIVERY AND COOPERATION:** BFBD shall use  commercially reasonable efforts to deliver to DISTRIBUTOR sufficient quantities of the Products to supply Outlets requesting service in the Sales Area, to assist in the development of new Outlets, to pursue the development of new Products, to preserve and develop the quality and marketability of the Products and to assist and cooperate with DISTRIBUTOR'S sales efforts, except that BFBD shall not be responsible for failures caused by Force Majeure.

**§5.2  SALES TO CHAINS:** In order to enable DISTRIBUTOR to pursue business opportunities with Chains, which may require standard terms for all DISTRIBUTORS, DISTRIBUTOR hereby designates BFBD and its affiliates and BFBD hereby agrees to act, as DISTRIBUTOR'S agent.  BFBD shall use commercially reasonable efforts to obtain from Chains authorization to sell Products in the Chains and information regarding the prices and terms at which the Chains would be willing to purchase Products for their Outlets, and BFBD will communicate the information concerning such authorizations, prices and terms to DISTRIBUTOR.  This appointment of BFBD and its affiliates as DISTRIBUTOR'S agent shall not prevent DISTRIBUTOR from having the right to negotiate prices and terms directly with a Chain and selling Products to the Chain at whatever prices and terms DISTRIBUTOR can negotiate.  In addition, DISTRIBUTOR shall have the option to revoke the designation of BFBD as DISTRIBUTOR'S agent at any time on thirty (30) days notice.  Nothing herein shall require BFBD to pay slotting allowances or other similar fees or charges imposed by the Chains.

## ARTICLE 6
## TRANSFER OF RIGHTS

**§6.1**   **CONDITIONS OF ASSIGNABILITY:** The Distribution Rights are owned by the DISTRIBUTOR and may be sold or otherwise transferred in whole or in part by DISTRIBUTOR, or in the event of DISTRIBUTOR'S death, by a legal representative of DISTRIBUTOR'S estate, provided that any such sale or transfer shall be subject to: (a) the prior written approval of BFBD, which approval will not be unreasonably withheld; and (b) a right of first refusal on the part of BFBD at the same terms and conditions offered to DISTRIBUTOR or DISTRIBUTOR'S estate (the "Offer") by a bona fide purchaser or transferee (the "Offeror").   The right of approval and right of refusal referred to herein shall expire unless DISTRIBUTOR is notified by BFBD that it does not approve the sale or transfer or that it wishes to exercise its right of first refusal by notice given within ten (10) days after the last to occur of the following:

(i) receipt by BFBD of written notice of intent to sell or transfer to a named Offeror on terms and conditions fully set forth in such notice, and

(ii) receipt by BFBD of the Offeror's current financial statements and such additional information concerning the Offeror's financial condition, credit, driving records and other matters reasonably appropriate to BFBD in its determination.   If the contemplated sale or transfer is not a bona fide transfer for value, the price to be paid by BFBD shall be the market value of the Distribution Rights at the time of receipt of such notice of intent.

If BFBD right of approval and right of first refusal expire as provided above, DISTRIBUTOR may consummate the transfer to the Offeror on the terms of the Offer; provided (i) such action or inaction will not eliminate or in any way affect BFBD right of approval or its right of first refusal on future transfers of the Distribution Rights; and (ii) if no transfer to the Offeror is consummated on the terms of the Offer within 90 days

after the expiration of BFBD right of approval or right of first refusal, all of the provisions of this Section 6.1 shall reapply.

**§6.2** **DEATH:** In the event of the death of DISTRIBUTOR, BFBD may require the DISTRIBUTOR'S estate to sell the Distribution Rights.  If the estate does not sell such Distribution Rights within a period of ninety (90) days from the date on which BFBD requires it to do so, BFBD shall have the right to sell the same, as the estate's agent, to a qualified purchaser.

**§6.3** **PROCEEDS:** Any sale shall be for the account of DISTRIBUTOR or DISTRIBUTOR'S estate, and the proceeds of the sale, after deducting there from any monies owed by DISTRIBUTOR to BFBD, all reasonable costs and expenses in connection with the sale (including without limitation the cost of removing any off code or damaged Products in DISTRIBUTOR'S Sales Area) and the satisfaction of any outstanding debts, liens, security interests, legal fees and similar expenses, shall be turned over to DISTRIBUTOR or DISTRIBUTOR'S estate.

**§6.4** **TRANSFER DOCUMENTS:** In the event of a sale or transfer by or for the account of DISTRIBUTOR or DISTRIBUTOR'S estate as described in this Article 6, the DIS-TRIBUTOR or the estate shall execute an appropriate bill of sale to the purchaser, and a general release terminating, canceling and surrendering DISTRIBUTOR'S rights under this Agreement and releasing any and all claims against BFBD and its affiliates and its officers, directors, shareholders, employees, successors and assigns arising under or out of this Agreement, and BFBD agrees to enter into a new Distribution Agreement with the purchaser in the form of agreement then being used by BFBD.

## ARTICLE 7
## SERVICE FAILURES AND CHANGES

**§7.1** **PARTIAL ABANDONMENT:** If DISTRIBUTOR fails to service any Outlet in the Sales Area and such failure is not remedied within three (3) days after receipt of written notice thereof, then, in addition to any other lawful rights and remedies BFBD may have, BFBD may deem such Outlet abandoned and may make other arrangements for the service thereof.  DISTRIBUTOR shall not be entitled to any proceeds derived from such service or proceeds in connection with the sale of Distribution Rights to such Outlet

**§7.2** **CHANGE IN DELIVERY METHOD:** In the event any Outlet makes an independent determination to accept delivery of the Products by any method other than store door delivery, and so informs BFBD or DISTRIBUTOR, the informed party shall  promptly communicate to the other the service requirements and terms under which the Outlet now desires service, and provided those new service requirements continue to call for delivery in the Sales Area, DISTRIBUTOR shall have the first right to effect such alternative service.  DISTRIBUTOR shall elect to provide such alternative services by (i) providing written notice thereof to BFBD within five (5) days after receiving notice of the alternative service requirements, and (ii) commencing such alternative service promptly thereafter (or on such schedule as may be acceptable to the Outlet).  If DIS-TRIBUTOR elects not to effect such alternate service or if the Outlet's new requirements include delivery outside the Sales Area, BFBD shall thereafter be permitted to make other arrangements to serve such Outlet, which service shall not be deemed to violate DISTRIBUTOR'S rights hereunder and DISTRIBUTOR shall not be entitled to any proceeds derived from such service.  However, DISTRIBUTOR shall continue to own those Distribution Rights defined herein to the Outlet within the Sales Area.

§7.3   **TEMPORARY SERVICE BY BFBD:** If DISTRIBUTOR or DISTRIBUTOR'S estate, as the case may be, is not able to or does not perform the obligations under this Agreement, DISTRIBUTOR or DISTRIBUTOR'S estate shall make other adequate provision for such performance at the expense of DISTRIBUTOR or DISTRIBUTOR'S estate. If no such provision is made, BFBD, within the limits of its ability to do so, may make arrangements to have these obligations performed for the account of DISTRIBUTOR, deducting from the revenues generated the reasonable expenses of such performance and delivering the balance, if any, to DISTRIBUTOR. Such temporary performance shall not relieve DISTRIBUTOR of any of the obligations imposed by this Agreement, constitute an assumption by BFBD of any obligations of DISTRIBUTOR, nor act to cure any default which may exist on the part of DISTRIBUTOR.

## ARTICLE 8
## TERMINATION

§8.1   **BREACH:** Except as set forth in this Article or upon the sale or transfer of all of the DISTRIBUTOR'S Distribution Rights, this Agreement shall not be terminated or canceled provided DISTRIBUTOR carries out the terms hereof. In the event of DISTRIBUTOR'S breach of any obligations or covenants under this or any other Agreement with BFBD, BFBD may terminate the Agreement as set forth below.

§8.2   **NON-CURABLE BREACH:** If the breach by DISTRIBUTOR involves criminal activity or fraud, threatens public health or safety, or threatens to do significant harm to BFBD, its affiliates, it operations, its trademarks or commercial reputation, BFBD may

terminate this Agreement immediately upon written notice and DISTRIBUTOR shall have no right to cure.

§8.3 **CURABLE BREACH:** In the event of breach by DISTRIBUTOR other than under §8.2, BFBD shall give DISTRIBUTOR three (3) business days written notice within which DISTRIBUTOR may cure the breach. If DISTRIBUTOR fails to cure such breach within said three (3) day period, BFBD may thereafter terminate this Agreement and DISTRIBUTOR shall have no further right to cure; provided, further, that the parties agree that repeated violations constitute a chronic breach and threaten significant harm to BFBD, its operations, its trademarks or commercial reputation, and in such event BFBD shall be entitled to terminate this Agreement pursuant to §8.2 and DISTRIBUTOR shall have no further right to cure.

§8.4 **ACTIONS FOLLOWING TERMINATION:** Termination under §8.2 or §8.3 above shall entitle BFBD to operate the business for the account of the DISTRIBUTOR, deducting from the revenues generated the reasonable expenses of such performance and delivering the balance, if any, to DISTRIBUTOR. Termination shall require DISTRIBUTOR to sell the Distribution Rights, and in the event that DISTRIBUTOR has not consummated a sale to a qualified purchaser within 90 days of the date of termination, BFBD shall be authorized to sell DISTRIBUTOR'S Distribution Rights to a purchaser at the best price which can be obtained after proper notice and advertisement. Said sale shall be for the account of the DISTRIBUTOR, and the provisions of §6.3 and §6.4 hereof shall apply.

## ARTICLE 9
## TRANSFER FEE

**§9.1**  **PAYMENT OF FEE:** In the event of a sale or transfer by DISTRIBUTOR or by BFBD for the account of DISTRIBUTOR of all or any portion of DISTRIBUTOR'S Distribution Rights, including a sale to BFBD, DISTRIBUTOR shall pay a Transfer Fee to BFBD in an amount equal to TWO PER CENT (2%) of the sales price, in full consideration for the administrative activities undertaken by BFBD in connection therewith.

## ARTICLE 10
## TRADEMARKS, TRADE NAMES
## AND COMPUTER SOFTWARE USAGE

**§10.1**  **PERMISSION FOR USE:**  BFBD hereby grants to DISTRIBUTOR a limited, non-exclusive right in the Sales Area only to use the trademarks set forth on Schedule B and any other trademarks, trade names or graphical designations on the packaging of the Products supplied by BFBD to DISTRIBUTOR hereunder (the "Marks"), solely to identify said products and to identify DISTRIBUTOR as a distributor of said products. DISTRIBUTOR acknowledges that the Marks are the exclusive property of BFBD or its affiliates, or if applicable, the licensor thereof, as the case may be (the "Owners"), and DISTRIBUTOR agrees that it will not dispute or contest the exclusive right, title and interest of the Owners in, or the validity of, any of the Marks.  DISTRIBUTOR acknowledges that it does not have, and will not acquire, any right, title or interest in any of the Marks or in the good will now or hereafter attaching thereto, and that all such goodwill shall inure solely to the benefit of the Owner of each Mark.  DISTRIBUTOR agrees that it shall not use any of the Marks in any corporate title or trading name of any corporation, company, partnership, association, business or sole proprietorship of the

DISTRIBUTOR, or with which the DISTRIBUTOR may become affiliated or related through ownership or otherwise.  DISTRIBUTOR agrees that it shall not tamper with any of the Marks or other written matter or graphical designations on the packaging of the products supplied by BFBD to DISTRIBUTOR hereunder and shall not otherwise modify or change the packaging thereof in any way.  Any marketing or promotional material proposed to be used by DISTRIBUTOR which references the Marks (other than marketing or promotional material supplied by BFBD or any of the Owners) shall be submitted to BFBD for approval, and said material shall not be used without the prior written consent of BFBD.

§10.2 **SOFTWARE ACCOUNTING SYSTEM:** DISTRIBUTOR is hereby authorized to use any proprietary software system and program developed by BFBD or its affiliates for route sales accounting as the same may be amended from time to time, but shall acquire no other interest or right in the software and shall not attempt to modify, decompile, disassemble or otherwise reverse engineer the software.

§10.3 **RETURN UPON TERMINATION:** Upon the termination of this Agreement or of DISTRIBUTOR'S right to use any of the Marks, DISTRIBUTOR shall immediately cease its use of the Marks (or the terminated Marks, as the case may be), and shall not thereafter use any trademarks, trade names or other designations associated with or confusingly similar to said Marks, or make any representations, directly or indirectly, that it continues to distribute products bearing said Marks.

## ARTICLE 11
## MISCELLANEOUS

**§11.1 NOTICES:** Any notice required or permitted under this Agreement shall be deemed properly given when personally received or one (1) day after delivery to an overnight courier service for first day delivery, or five (5) days after deposit in the mails, return receipt requested, first class postage pre-paid. All notices shall be addressed to DISTRIBUTOR at the address stated above and to BFBD, at the address indicated in Schedule B attached hereto. Either party may designate another address for receipt of notices by written notice duly given in accordance with this §11.1.

**§11.2 SURVIVAL; BFBD AFFILIATES:** This Agreement shall be binding upon heirs, personal representatives, successors or assigns of the parties hereto. The parties recognize and agree that any obligations of BFBD hereunder may from time to time be undertaken by affiliates of BFBD but BFBD shall remain responsible therefore.

**§11.3 INCORPORATION BY REFERENCE:** This Agreement is subject to and affected by the terms and conditions of a certain Bill of Sale executed by the parties immediately prior hereto and said Bill of Sale and the Schedules hereto, are incorporated herein by reference as though fully set forth in this Agreement.

**§11.4 ENTIRE AGREEMENT:** This Agreement, together with the Bill of Sale referred to in §11.3 above and any other agreements executed between the parties on even date herewith, sets forth the entire agreement between the parties and supersedes all prior agreements, discussions, negotiations, understandings, representations, conditions, warranties and covenants between them with respect to this subject matter. Unless set forth herein, neither party shall be liable for any representation made to the other. This Agreement may be amended or modified only by a writing signed by both parties.

**§11.5 <u>INDEMNIFICATION</u>:** Each party hereby agrees to defend, indemnify and hold the other harmless against a third party as to any costs, charges or claims including, without limitation, reasonable attorneys' fees and costs of settlement which may arise out of such party or its employees' or independent contractors' direct or indirect failure to perform any obligation and/or discharge any liability arising hereunder.

**§11.6 <u>DESIGNATION AS AGENT</u>:** DISTRIBUTOR hereby irrevocably grants BFBD a limited power of attorney with full and complete authority to transfer DISTRIBUTOR'S Distribution Rights, or perform any of DISTRIBUTOR'S obligations hereunder for DISTRIBUTOR'S account in accordance with the terms of this Agreement. This appointment shall survive the death or disability of DISTRIBUTOR or the termination of this Agreement.

**§11.7 <u>ACQUISITIONS</u>:** Notwithstanding anything to the contrary contained herein, this Agreement shall not apply to any products or product lines obtained by BFBD, or any corporation related thereto, through acquisition after the date hereof.

**§11.8 <u>CONTROLLING LAW</u>:** The validity, interpretation and performance of this Agreement shall be controlled by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

**§11.9 <u>NECESSARY MODIFICATION</u>:** In the event any provision of this Agreement is found to be invalid, contrary to, or in conflict with any applicable present or future law or regulation in a final ruling by any court, agency or tribunal possessing competent jurisdiction, this Agreement shall be deemed modified to the extent necessary to conform with any such ruling, law or regulation. The remainder of this Agreement shall not be affected thereby and shall remain in full force and effect.

**§11.10<u>COUNTERPARTS</u>:** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument.

§11.11 <u>TIME CALCULATION:</u>   In computing the number of days for purposes of this Agreement, all days shall be counted, including Saturdays, Sundays, and holidays; provided, however, that if the final day of any time period falls on a Sunday, or holiday, then the final day shall be deemed to be the next day which is not a Sunday or holiday.

§11.12 <u>DAMAGES:</u>   **Notwithstanding anything to the contrary contained in this Agreement, in no event shall either party be liable to the other for any consequential, incidental, indirect or special damages, including lost profits and punitive damages.**

§11.13 <u>NO JURY TRIAL:</u> **The parties hereby knowingly, voluntarily and intentionally waive the right either of them may have to a trial by jury in respect of any litigation based hereon or arising out of this Agreement or any acts, omissions, transactions or course of dealing hereunder.**

IN WITNESS WHEREOF, BFBD and DISTRIBUTOR have caused this Agreement to be duly executed as of the day and year first above written.

**BIMBO FOODS BAKERIES
DISTRIBUTION INC. (BFBD)**

By: _____          _____
    **CLAUDIA COSCIA, SECRETARY**          **DISTRIBUTOR**

## SCHEDULE "A"
## SALES AREA DESCRIPTION

**BRANCH: Frederick      140**                  Sales Area #                  **6082**

less otherwise indicated, only the inside (side facing the interior of the territory) of all the city, town, or state lines, rivers or
ural boundaries or border streets and highways is included in the Sales Area. The location of any Outlet shall be determined by
street address. There are no additions or exceptions unless noted.

| | | | | |
|---|---|---|---|---|
| ginning at a Point where the | | US-340 | intersects with the | Lander Rd |
| Proceed | on the | Lander Rd | to intersection of | Maryland/Virginia State Line |
| Then | on the | Maryland/Virginia State Line | to intersection of | Frederick/Montgomery County Line |
| Then | on the | Frederick/Montgomery County L | to intersection of | I-270 |
| Then | on the | I-270 | to intersection of | SR-85 (Buckeystown Road) |
| Then | on the | SR-85 (Buckeystown Road) | to intersection of | Grove Rd |
| Then | on the | Grove Rd | to intersection of | Industry Lane |
| Then | on the | Industry Lane | to intersection of | Guilford Rd |
| Then | on the | Guilford Rd | to intersection of | New Design Rd |
| Then | on the | New Design Rd | to intersection of | Stadium Drive |
| Then | on the | Stadium Drive | to intersection of | Market Street |
| Then | on the | Market Street | to intersection of | 14th Street |
| Then | on the | 14th Street | to intersection of | Motter Avenue |
| Then | on the | Motter Avenue | to intersection of | Thomas Johnson Drive |
| Then | on the | Thomas Johnson Drive | to intersection of | Taney Avenue |
| Then | on the | Taney Avenue | to intersection of | 7th Street |
| Then | on the | 7th Street | to intersection of | US-15 |
| Then | on the | US-15 | to intersection of | US-340 |
| Then | on the | US-340 | to intersection of | The the Point and Place of |

**Additions:** This Sales Area includes the following area or accounts:

Sam's Club #6652  Rt 85 Buckeystown Pike, Frederick, MD
Weis #110, 199 Thomas Johnson Dr, Frederick, MD
Safeway #1075 - 927 W. 7th St. Frederick MD

**Exceptions:** This Sales Area excludes the following area or accounts

Weis #60 - Jefferson St., Frederick, MD

## SCHEDULE "B"
## CONTRACTUAL DEFINITIONS:

The following definitions shall apply for the purposes of this Distribution Agreement:

OUTLETS: As referred to in §1.2, Outlets shall mean all retail stores restaurants and institutional accounts which purchase Products by store door delivery. Outlets shall not be deemed to include street vendors or any Outlets or parts thereof, including concessions and vending machines therein, serviced by methods other than store door delivery, or bakery thrift stores established or operated by, or contracted with BFBD or its affiliates for the primary purpose of selling damaged, stale, off code products, although such bakery thrift stores may also sell any products, fresh or otherwise, which BFBD or its affiliates, in their sole discretion, deem appropriate to support that purpose.

PRODUCTS: As referred to in §1.3, Products shall mean all fresh baked breads, rolls, Italian bread shells, cereal bars, muffins, cakes, pies, bread stuffings, packaged croutons and similar fresh baked products intended to be sold as fresh, and sold under the names and trademarks:

ARNOLD   THOMAS'   ANZIO & SONS
HARRIS TEETER (PRIVATE LABLE)

Products shall not include products distributed by BFBD under any names or trademark other than those listed above, products intended to be sold as frozen or refrigerated, or damaged, stale, or off code products or product produced to supplement bakery thrift store inventory to facilitate a thrift recovery system.

ADDRESS FOR NOTICE: As referred to in §11.1, notices to BIMBO FOODS BAKERIES DISTRIBUTION INC. shall be addressed to:
Bimbo Foods Bakeries Distribution Inc.
255 Business Center Drive
Horsham, PA  19044
Attention:  VP of Sales

GWBD Schedule B

E-FILED; Montgomery Circuit Court
Docket: 2/4/2022 1:27 PM; Submission: 2/4/2022 1:27 PM

# EXHIBIT D

# BILL OF SALE

**T**HIS BILL OF SALE is made and entered in **DECEMBER 3, 2012,** by and between **BIMBO FOODS BAKERIES DISTRIBUTION INC. ("BFBD")** with a place of business at **255 BUSINESS CENTER DRIVE HORSHAM PENNSYLVANIA 19044** ("SELLER") and **WALTER DAVIS** doing business at **5311 SOVEREIGN PL FREDERICK MARYLAND 21703** ("PURCHASER").

In consideration of the sum of **($5,471.00) FIVE THOUSAND FOUR HUNDRED SEVENTY ONE DOLLARS AND 00/100THS** paid by PURCHASER to SELLER, SELLER hereby sells, transfers, conveys, assigns, and delivers to PURCHASER, and PURCHASER hereby purchases, accepts, assumes and receives from SELLER, all of SELLER'S right, title and interest in and to the following assets, properties, rights and interests (collectively, the "ASSETS"):

(a) the Distribution Rights to sell and distribute Products manufactured and/or distributed by Bimbo Foods Bakeries Distribution Inc.., ("BFBD") or its subsidiaries, affiliates or divisions to Outlets in the geographic area described on **Schedule A** attached hereto, which Products, Outlets and Distribution Rights are defined by, subject to and further evidenced by a written Distributor's Agreement previously executed between BFBD and SELLER;

**TO HAVE AND TO HOLD** the same, with the appurtenances thereof, unto the PURCHASER , his successors and assigns, forever, to his own proper use and behalf.

SELLER hereby represents and warrants to PURCHASER for himself and his successors that SELLER is the sole owner of and has good and marketable title to all of the Assets and conveys them to PURCHASER free and clear of any mortgage, lien, claim, right, security interest, encumbrance, covenant, easement or restriction of any kind or nature.

EXCEPT AS EXPRESSLY SET FORTH HEREIN, THE ASSETS ARE CONVEYED "AS IS" AND "WHERE IS" WITH ALL FAULTS, WITHOUT ANY EXPRESS OR IMPLIED REPRESENTATION AND WARRANTY OF ANY KIND WHATSOEVER,

INCLUDING, WITHOUT LIMITATION, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, CONDITION, QUANTITY OR OTHERWISE, AND ALL SUCH WARRANTIES EXPRESS OR IMPLIED, ARE HEREBY DISCLAIMED.

**IN WITNESS WHEREOF**, SELLER and PURCHASER have caused this Bill of Sale to be duly and properly executed as of the day and year first above written.

**BIMBO FOODS BAKERIES DIST INC.**

NAME: Michael Taylor

TITLE: Area Sales Manager
**SELLER**

NAME: Walter Davis
**WALTER DAVIS**
**PURCHASER**

# SCHEDULE "B"

## CONTRACTUAL DEFINITIONS:

**BRANCH: Frederick, MD**                     **SALES AREA #:6082**

The following definitions shall apply for the purposes of this Distribution Agreement:

**OUTLETS:** As referred to in §1.2, Outlets shall mean all retail stores restaurants and institutional accounts which purchase Products by store door delivery. Outlets shall not be deemed to include street vendors or any Outlets or parts thereof, including concessions and vending machines therein, serviced by methods other than store door delivery, or bakery thrift stores established or operated by, or contracted with BFBD or its affiliates for the primary purpose of selling damaged, stale, off code products, although such bakery thrift stores may also sell any products, fresh or otherwise, which BFBD or its affiliates, in their sole discretion, deem appropriate to support that purpose.

**PRODUCTS:** As referred to in §1.3, Products shall mean all fresh baked breads, rolls, Italian bread shells, cereal bars, muffins, cakes, pies, bread stuffings, packaged croutons and similar fresh baked products intended to be sold as fresh, and sold under the names and trademarks:

**ANZIO & SONS**
**ARNOLD**                     **BUTTER KRUST**                     **THOMAS**
**BAKERS PRIDE**               **EARTH GRAINS**
**HOLSUM**
**SARA LEE FRESH BREAD & ROLLS (not including Sweet Baked Goods)**

Products shall not include products distributed by BFBD under any names or trademark other than those listed above, products intended to be sold as frozen or refrigerated, or damaged, stale, or off code products or product produced to supplement bakery thrift store inventory to facilitate a thrift recovery system.

**ADDRESS FOR NOTICE:** As referred to in §11.1, notices to BFBD shall be addressed to:
**Bimbo Foods Bakeries Distribution Inc.**
**255 Business Center Drive**
**Horsham, PA  19044**

E-FILED; Montgomery Circuit Court
Docket: 2/4/2022 1:27 PM; Submission: 2/4/2022 1:27 PM

# EXHIBIT E

——Original Message——
From: Walter Davis <wrdandco@aol.com>
To: fred.penny@grupobimbo.com <fred.penny@grupobimbo.com>
Cc: don.kraft@grupobimbo.com <don.kraft@grupobimbo.com>; bernard.harvey@grupobimbo.com
<bernard.harvey@grupobimbo.com>; samuel.bartles@grupobimbo.com <samuel.bartles@grupobimbo.com>;
Bj.dissinger@grupobimbo.com <Bj.dissinger@grupobimbo.com>
Sent: Tue, Nov 2, 2021 4:53 pm
Subject: Re: Fulfillment Center

Good Afternoon,

I'd first like to introduce myself. My name is Walter Davis. I was a manager at Giant Food for 34 years and then became a
business partner with Bimbo Bakeries, formerly George Weston Bakeries,  in January 2011. I am a hard worker and have
a good reputation with the company and the stores I service.

There is a Kroger Fulfillment center opening soon within my territory, Schedule A (#6082). In anticipation of servicing the
fulfillment center I began a search for a new, larger vehicle. I was told that, although the fulfillment center is within my
territory, I will not be the independent owner/operator. I have reached out to various persons within the company to
request in writing the language or clause in the contract that speaks directly to disentitlement. I have not received any
consistent explanation as to why I would not be afforded opportunity to provide product to the fulfillment center and have
not been told who would service it, if not myself. Additionally, no one has identified to me the contract clause stating that I
am not entitled to service a fulfillment center within my territory. I have not received any written documentation regarding
the aforementioned requests. I am hoping you will be able to help resolve this matter. I appreciate your time.

1

# Bimbo Foods Bakeries Distribution, LLC

Via: Hand Delivery                                                    November 8, 2021

Walter Davis
5311 Sovereign Pl
Frederick, MD  21703

RE:     **<u>Distribution Rights</u>**

Dear Mr. Davis:

Please allow this letter to serve as the written explanation you requested as to why your BFBD distribution agreement does not provide you with the right to sell Product to a warehouse/fulfilment center.

Sections 1.4 and 2.1 of your BFBD distribution agreement describe how you are granted the right to sell certain BFBD Products to "Outlets" in your Sales Area. Outlets are defined in your distribution agreement by Section 1.2 and Schedule B. In this regard, Schedule B specifically states:

> **OUTLETS: As referred to in § 1.2, Outlets shall mean all retail stores restaurants and institutional accounts which purchase Products by store door delivery.**

The facility that may open in your Sales Area, that prompted your inquiry and this response, is projected to be a warehouse/fulfillment center. If/when this facility does open, it will NOT be a *retail store, restaurant, or institutional account* (per the definition of Outlet) and it will NOT purchase BFBD products via *store door delivery* (again, per the definition of Outlet). Therefore, it is very clear that your distribution agreement does not grant you the right to sell Products to this facility.

BFBD is aware, through your email and based on several discussions with you, that you've asked to be shown where the distribution agreement states that you don't have the right to sell products to this facility. There is no provision that says, "you do not have the right to sell to a fulfillment center." However, please understand that is not how contracts work. Your distribution agreement does not give you the rights to everything on the planet that it fails to specifically exclude. You only have the rights to what the distribution agreement specifically grants you. As mentioned above, your distribution agreement grants you ONLY the right to sell Products to Outlets in a Sales Area. Further, it is explained above how the contractual definition of "Outlet" does not include a warehouse/fulfillment center because such a facility is not a retail store and does not purchase product via store door delivery.

Respectfully,

Bimbo Foods Bakeries Distribution, LLC

1

# akerman

Daniel R. Miktus

Akerman LLP
The Victor Building
750 9th Street, N.W., Suite 750
Washington, DC 20001

T: 202 393 6222
F: 202 393 5959
Email: daniel.miktus@akerman.com

November 9, 2021

**VIA US CERTIFIED MAIL**

Bimbo Foods Bakeries Distribution Inc.
Attn: VP of Sales
255 Business Center Drive
Horsham, PA 19044

Re:   **Distribution Agreement with Walter R. Davis**

To Whom It May Concern:

I represent Walter R. Davis ("Mr. Davis") in connection with his discussions with Bimbo Foods Bakeries Distribution Inc. ("Bimbo") regarding the distribution rights to the forthcoming Kroger fulfillment center in Frederick, Maryland (the "Fulfillment Center"). Please include me on all future correspondence with Mr. Davis concerning this matter.

As you know, Mr. Davis and Bimbo entered into a Distribution Agreement, dated January 10, 2011, which provided Mr. Davis the exclusive Distribution Rights for certain Products to any Outlet within the defined Sales Area (the "Distribution Agreement"). Mr. Davis has satisfactorily performed his obligations under the Distribution Agreement for over 10 years. Recently, Mr. Davis learned that grocery retail chain Kroger is planning to open the Fulfillment Center in his Sales Area. Pursuant to the terms of the Distribution Agreement, Mr. Davis should receive exclusive Distribution Rights over the Fulfillment Center. Mr. Davis inquired with Bimbo as to how and when these Distribution Rights would take effect.

At first, Mr. Davis was informed by Bimbo employees at his product depot that he would receive Distribution Rights over the Fulfillment Center. However, other Bimbo employees backtracked and informed Mr. Davis verbally that he would not receive such Distribution Rights. On November 2, 2021, Mr. Davis inquired via email as to the specific provision of the Distribution Agreement that prevented him from receiving Distribution Rights over the Fulfillment Center.

On November 8, 2021, Mr. Davis received a letter from Bimbo, claiming that Mr. Davis would not receive Distribution Rights over the Fulfillment Center because the Fulfillment Center is not an "Outlet" as defined by the Distribution Agreement in Schedule B, Section 1.2. Specifically, Bimbo asserts that the Fulfillment Center is not a retail store, restaurant, or institutional account, and the Fulfillment Center will not purchase Products via store door delivery.

akerman.com

Without any other support, Bimbo's letter then states that *"it is very clear that your distribution agreement does not grant you the right to sell Products to this facility."*

Mr. Davis disagrees with this conclusion. Pursuant to the Distribution Agreement, Mr. Davis has exclusive Distribution Rights to the Products for any "Outlet" in the "Sales Area." There is no dispute that the Fulfillment Center is within the Sales Area as defined in Schedule A to the Distribution Agreement. Bimbo's position simply appears to be that the Fulfillment Center is not an "Outlet." Distribution Agreement Section 1.2 defines "Outlets" as *"those purchasers of products as specifically defined and described in Schedule B."* Schedule B further defines "Outlets" as follows:

> *Outlets shall mean all retail stores restaurants and institutional accounts which purchase Products by store door delivery. Outlets shall not be deemed to include street vendors or any Outlets or parts thereof, including concessions and vending machines therein, serviced by methods other than store door delivery, or bakery thrift stores established or operated by, or contracted with BFBD or its affiliates for the primary purpose of selling damaged, stale, off code products, although such bakery thrift stores may also sell any products, fresh or otherwise, which BFBD or its affiliates, in their sole discretion, deem appropriate to support that purpose.*

The Fulfillment Center fits squarely within this definition. Moreover, the Fulfillment Center is not part of one of the excluded categories in this definition.

Bimbo states in its November 8, 2021 letter that the Fulfillment Center is not considered an "Outlet" because it is not a retail store, restaurant, or institutional account. The terms retail store, restaurant, and institutional account are not defined by the Distribution Agreement, and Bimbo provides no further support for its assertion. Merriam-Webster defines "retail store" as "***a place of business*** *usually owned and operated by a retailer but sometimes owned and operated by a manufacturer or by someone other than a retailer* ***in which merchandise is sold primarily to ultimate consumers.***" (emphasis added). The Fulfillment Center clearly meets this definition – it is a place of business for Kroger to sell merchandise (groceries) to its ultimate consumer. Simply because consumers purchase the merchandise via the internet instead of in-store does not change this fact.[1]

---

[1] Kroger and its Fulfillment Center partner acknowledge that Kroger customer fulfillment centers constitute grocery retail: "'*The introduction of the first Customer Fulfillment Center marks a historic milestone for **grocery retail** in the U.S.,*' said Tim Steiner, Co-founder and CEO of Ocado Group." See https://ir.kroger.com/CorporateProfile/press-releases/press-release/2021/Kroger-Delivery-Introduces-Americas-First-Customer-Fulfillment-Center/default.aspx. According to Supermarket News, Kroger recently "*entered eMarketer's annual list of Top 10 U.S.* ***Retail*** *E-Commerce Companies.*" See https://www.supermarketnews.com/online-retail/kroger-breaks-top-10-us-e-commerce-companies. Frederick County, Maryland's Office of Economic Development also acknowledges that the Fulfillment Center is a retail store: "*The Kroger Co., the nation's largest grocery* ***retailer***, *today announced plans to construct a high-tech fulfillment center in Frederick County. Kroger is partnering with the Ocado Group, the world's largest* ***online grocery retailer***, *which will provide and maintain the digital and robotic equipment used at the facility.*" See https://www.discoverfrederickmd.com/news/kroger-ocado-select-frederick-county-for-new-high-tech-fulfillment-center.

Bimbo's November 8, 2021 letter also asserts that the Fulfillment Center will not purchase Products via store door delivery. Again, the Distribution Agreement does not define "store door delivery" and Bimbo provides no additional support for this assertion. Publicly-available sources define "store door delivery" as *The movement of goods to the consignee's place of business, customarily applied to movement by truck.*[2]  Again, the method by which Mr. Davis will supply/sell Products to the Fulfillment Center fits this definition. Mr. Davis will deliver Products from the Bimbo product depot to Kroger's place of business – the Fulfillment Center – via truck.

Even if the Fulfillment Center does not employ "store door delivery," Mr. Davis still has the option to sell Products to the Fulfillment Center by the alternative method selected. Distribution Agreement Section 7.2 provides in relevant part:

> *In the event any Outlet makes an independent determination to accept delivery of the Products by any method other than store door delivery, and so informs BFBD or DISTRIBUTOR, the informed party shall promptly communicate to the other the service requirements and terms under which the Outlet now desires service, and provided those new service requirements continue to call for delivery in the Sales Area, DISTRIBUTOR shall have the first right to effect such alternative service . . . .*

Bimbo's November 8, 2021 letter is the first time that Bimbo informed Mr. Davis that it believes that the Kroger Fulfillment Center has elected to accept delivery by a method other than store door delivery. Mr. Davis demands that Bimbo promptly disclose the method by which the Fulfillment Center will accept delivery, if other than store door delivery, in accordance with Section 7.2. Pursuant to the Distribution Agreement, Mr. Davis reserves his right to elect to provide such alternative service, once Bimbo informs Mr. Davis of the service requirements and terms under which the Fulfillment Center now desires service.

Because the Fulfillment Center meets the definition of an "Outlet" under the Distribution Agreement, as outlined above, and the Fulfillment Center will purchase Products within the Sales Area, Mr. Davis has exclusive Distribution Rights under the Distribution Agreement. This means that Mr. Davis has the sole right to sell and distribute Products to the Fulfillment Center. Mr. Davis therefore demands that Bimbo refrain from supplying/selling Products to the Fulfillment Center via any other method. Further to this, Mr. Davis requests that Bimbo promptly provide the following information:

1.  Does Bimbo intend to sell "Products" to the Fulfillment Center?

2.  Through which method of supply and/or delivery does Bimbo intend to sell Products to the Fulfillment Center?

---

Mr. Davis also maintains that the Fulfillment Center meets the definition of an "institutional account." Kroger is the largest supermarket chain in the country (https://www.foodindustry.com/articles/top-10-grocers-in-the-united-states-2019/), and Bimbo no doubt has accounts with countless other Kroger locations.
[2] *See* https://www.globalnegotiator.com/international-trade/dictionary/store-door-delivery/.

3.  Who does Bimbo intend to have supply and/or deliver Products to the Fulfillment Center?

This correspondence is without prejudice to, and with full reservation of, Mr. Davis' rights and remedies under the Distribution Agreement and under applicable law.

Please let me know if you have any questions or wish to discuss this matter.

Respectfully,

**AKERMAN LLP**

*/s/ Daniel R. Miktus*
Daniel R. Miktus

c:     Walter R. Davis (via email)
Don Kraft (via email: don.kraft@grupobimbo.com)
Bernard Harvey (via email: bernard.harvey@grupobimbo.com)
Samuel Bartles (via email: samuel.bartles@grupobimbo.com)
BJ Dissinger (via email: bj.dissinger@grupobimbo.com)
Fred Penny (via email: fred.penny@grupobimbo.com)



255 Business Center Drive
Horsham, PA  19044

MATTHEW C. WRIGHT
Associate General Counsel
Legal Department
Phone:  (215) 347-5549
Email Matthew.Wright@GrupoBimbo.com

November 24, 2021

**VIA: Email at daniel.miktus@akerman.com**

Akerman LLP
Attn: Daniel R. Miktus, Esq.
The Victor Building
750 9th Street, N.W., Suite 750
Washington, DC 20001

      Re:    **Walter Davis**

Attorney Miktus:

      I am Associate General Counsel for Bimbo Foods Bakeries Distribution, LLC ("BFBD"). Your letter dated November 9, 2021 has been referred to me for review and response. Please forward all future communication to BFBD in this matter to my attention.

      It appears that we disagree over the meaning of *retail store, institutional account,* and *store door delivery* as they are used in the Distribution Agreement. With all due respect, your interpretation of these terms flies in the face of decades of use and understanding within the entire commercial baking industry. That you believe you are correct (based on dictionaries and newspaper clippings) and the entire industry is wrong is not a reasonable position to take.

      Ultimately, I want to avoid a protracted argument filled with point-by-point rebuttals to each statement in your letter. However, there are a few comments that must be addressed. It is a complete misstatement of fact to say that the fulfilment center "is a place of business for Kroger to sell merchandise (groceries) to its ultimate consumer." First, the consumer does not order or pay for the product at this facility; there are no cash registers there (that alone says it is not a retail store). Second, the consumer does not take physical possession of the product at this facility. Third, the consumer never enters this facility, and (frankly) has no reason to even know this facility exists. The consumer orders online, and the order is either shipped to the consumer's house or they pick it up at an actual Kroger retail store. The consumer has zero interaction with the fulfillment center and couldn't even if they wanted to as it is a warehouse that does not permit the public inside. How many *retail stores* do you know of that don't allow the public in?

      Your arguments seem to suggest that simply because Kroger is a retailer that every building The Kroger Co owns is a *retail store.* Is Kroger's corporate office a retail store simply because Kroger is a retailer? The answer of course is no for the same reasons stated above, no order or payment onsite, no product exchange onsite, no consumer onsite…just like the fulfillment center. Given these facts,

there is no reality in which this fulfillment center is a *retail store*; any legal claim to the contrary is frivolous. Your contention that this fulfillment center is an *institutional account* and delivery to it would be *store-door delivery* also naively ignores customary industry norms and is equally without merit. I understand you need to make an argument on behalf of your client, and that is difficult because the facts are not in his favor. However, you have resorted to taking enormous leaps using twisted logic while attempting to define these terms. This approach is somewhat tolerable in a letter but moves to frivolous and unprofessional conduct if it forms the basis of any legal action.

Likewise, please take the time to read Section 7.2 carefully. This section of the Distribution Agreement is only applicable to *Outlets* (stores that Mr. Davis serves) that receive product via store-door delivery and subsequently ask to change the method through which they receive said product (to something other than store-door delivery). That is not what has happened here. The present circumstance is not a case where there has been a requested change of delivery method by an active customer (Outlet) of Mr. Davis. Even if Mr. Davis currently services a Kroger store (which he does not), Section 7.2 still wouldn't be applicable since Kroger stores are not asking for a change in delivery method; Kroger retail stores still receive Bimbo product via store door delivery. Said another way, the fulfillment center is not an existing Outlet of Mr. Davis that was store-door delivery and is now requesting an alternative to store-door delivery. Therefore, Section 7.2 is completely irrelevant and does not give Mr. Davis the right to effect service to the fulfillment center.

For what it might be worth, this is not a matter of first impression for us. BFBD currently has dozens of independent business partners across the country (with nearly identical distribution agreements as Mr. Davis) who signed separate agreements and have been serving similar fulfillment centers. They've done this having easily recognized that their distribution agreement does not otherwise provide them with said rights.

Finally, please understand that BFBD has patiently and repeatedly explained to Mr. Davis exactly how/why he does not have the contractual right to distribute BFBD products to the fulfillment center. Mr. Davis simply does not like the outcome, so he persists in arguing the same points over and over. What is more, he and you have copied the President of Bimbo Bakeries and other executives in the mistaken believe that this will force our hand into capitulating to Mr. Davis. It will not. BFBD is 100% confident in its (and the industry's) interpretation of the Distribution Agreement. You, of course, can take legal action if you want. However, you should fairly warn your client that the only realistic opportunity he has of serving this fulfillment center (once it is finished being built) is if BFBD chooses to offer him a contract do to so. That window has not yet closed, but I can't *imagine* anyone will find it helpful for Mr. Davis to keep poking his proverbial finger in BFBD's chest. He needs to understand that there are no additional words that can be said or legal actions that can be taken that will back us off our position.

Regards,

Bimbo Foods Bakeries Distribution, LLC

By:   Matthew Wright