IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

**WALTER R. DAVIS,**                            *

              *

        Plaintiff,               *

              *

v.                                                *          Civil No. **PJM 8:22-cv-663**

              *

**BIMBO FOODS BAKERIES**                 *

**DISTRIBUTION, f/k/a BIMBO FOODS**      *

**BAKERIES DISTRIBUTION, INC.,**          *

              *

        Defendant.              *

## MEMORANDUM OPINION

Walter Davis ("Davis") has sued Bimbo Foods Bakeries Distribution, formerly known as Bimbo Foods Bakeries Distribution, Inc. ("BFBD"), in an effort to vindicate his rights under an Agreement with BFBD to distribute its products to a new creature of the internet known as an automated fulfillment center. The key considerations for the Court are whether a Kroger automated grocery fulfillment center in Frederick, Maryland, and by extension any automated grocery fulfillment center in Davis's Sales Area, are "Outlets" and "retail stores" that purchase products "by store door delivery" within the meaning of the Parties' Distribution Agreement. Pl.'s Ex. 3 § 1.2, Schedule "B".

In November 2023, the Court held a four-day bench trial. Having considered the testimony, exhibits, arguments and post-trial briefs of the parties, the Court, in compliance with Rule 52(a) of the Federal Rules, makes the following Findings of Fact and Conclusions of Law. In the end, the Court finds in favor of Davis and awards him damages in the amount of four hundred and fifty-two thousand, three hundred forty-three dollars and forty-one cents ($452,343.41) in lost revenue, plus court costs. It also Enters a Declaratory Judgment in his favor.

## I.   BACKGROUND AND FACTUAL FINDINGS

BFBD is a nationwide baked goods manufacturer. Among the many goods BFBD produces are Sara Lee breads and Entenmann's donuts and cookies. In order to move its baked goods to facilities from which consumers can purchase them, BFBD has entered into distribution agreements with intermediaries, such as Davis, denominated "independent distributors" ("IDs").[1]

An overview of the relationship is that Davis is debited with the cost of baked grocery products from BFBD at a discount price, picks up BFBD products at a BFBD warehouse and delivers those products to third party grocery stores and the like, which in turn create receivables in favor of BFBD, which then takes the receivables back from Davis, and compensates him with the spread between the receivables created by the third party grocery stores and the discounted prices BFBD has debited to Davis.

Davis, sixty-four years old at the time of trial, has worked in the grocery industry for forty-six years. Trial Tr. Vol. 1 at 21:17–21, 37:16–18, 39:11–14. In January 2011, he executed the Distribution Agreement at issue in this case (Pl.'s Ex. 3), pursuant to which he began distributing BFBD products as an ID.[2] As the Agreement sets forth, Davis received from BFBD "the sole right

---

[1]      The Court pauses on the term "independent distributors" because it tends to becloud analysis of the case even before it begins. "Independent distributor" may suggest that someone in Davis's position might operate independently of BFBD in the sense that he purchases, *i.e.*, pays BFBD for its product, in effect closes out his transaction with BFBD, then takes the product to a third-party store where he sells the product at a mark-up to the store, and pockets the difference. That may be the case in some relationships between food manufacturers and food distributors. But, as the evidence has shown in this case, that is not exactly the relationship that Davis and BFBD actually have, which is much more nuanced and complex. As will be seen, the same is true when it comes to the meaning of the term "lost profits," the right to which Davis has waived under the Parties' Distribution Agreement. As will be discussed, however, "lost profits" can refer not only to consequential damages, which can be waived, but also direct damages, which ordinarily are not waived.

In this regard, the Court has very much in mind the caution of its first year college physics professor: "The idea first, then the name."

[2]      BFBD assigns exclusive rights to IDs to operate in specific geographic areas of the country. Davis's area is defined in Schedule A of the Distribution Agreement, and generally covers the county of Frederick, Maryland ("Sales Areas"). *See* Pl.'s Ex. 3, Schedule A.

to sell and distribute Products to Outlets in the Sales Area." Pl.'s Ex. 3 § 1.4; *see also* Pl.'s Exs. 1,

2.

Is the Kroger Automated Fulfillment Center an "Outlet"?

The Distribution Agreement defines the term as follows. "Outlets" are "those purchasers

of products as specifically defined and described in Schedule B attached hereto and made a part

hereof." Pl.'s Ex. 3 § 1.2. Schedule B provides:

> As referred to in §1.2, **Outlets shall mean all retail stores** restaurants and institutional accounts **which purchase Products by store door delivery**. Outlets shall not be deemed to include street vendors or any Outlets or parts thereof, including concessions and vending machines therein, serviced by methods other than store door delivery, or bakery thrift stores established or operated by, or contracted with BFBD or its affiliates for the primary purpose of selling damaged, stale, off code products, although such bakery thrift stores may also sell any products, fresh or otherwise, which BFBD or its affiliates, in their sole discretion, deem appropriate to support that purpose.

*Id.*, Schedule B (emphasis added).

Over the course of his operations under the Agreement, Davis has performed in the

following fashion. He drives to BFBD's distribution warehouse in Frederick, Maryland and loads

BFBD products into his vehicle. He then drives the products to each "Outlet" in his "Sales Area"

and delivers the products. Davis's activities often go beyond dropping products off at the store

door. Frequently he enters Outlets to stock shelves, rotate products, replace stale products, and put

up promotional material. His goal is to engage in activities that will help the store maximize

purchases of BFBD products. In this regard, the Distribution Agreement provides:

> In order to maximize its purchases from BFBD, [Davis] agrees to develop and maximize sales of Products to Outlets within the Sales Area by maintaining an adequate and fresh supply of Products in all Outlets; rotating Products to promote their sale before they become stale or off code; promptly removing all stale or off code Products; cooperating with BFBD or its affiliates in its marketing programs, maintaining a computer assisted record-keeping system compatible with the system maintained by BFBD now or in the future; and providing service on a basis

3

consistent with good industry practice to all Outlets requesting service in the Sales Area.

*Id.* § 4.1. Davis testified at trial, however, that, while he undertakes the additional actions listed in Section 4.1 of the Distribution Agreement when an Outlet requests it and because it helps drive his sales, he has never understood that such actions are <u>required</u> by the term "store door delivery," as defined in his Distribution Agreement. Trial Tr. Vol. 1 at 83:4–19; Vol. 2 at 288:10–290:5. Indeed, sometimes Outlets have explicitly requested that Davis <u>not</u> take one or more of the actions listed in Section 4.1. *Id.* Vol. 1 at 83:17–84:13; *see also id.* at 80:16–81:19. The grocery manager employed by the store Davis is delivering to dictates the level of service required from him, which can vary from store to store and is based on the grocery manager's individual preference. *See id.* at 43:10–18. That arrangement has never, until the onset of this litigation, precluded Davis from receiving compensation from BFBD under the Distribution Agreement.

But, as the Court has emphasized, Davis, who continues to work for BFBD under the Distribution Agreement with the exception of the Kroger Automated Fulfillment Center, does not simply "buy" products from BFBD, take them to an outlet, resell them to the Outlet and pocket the cash. He is compensated by BFBD weekly based on a Settlement Statement created by BFBD. *See* Pl.'s Ex. 5. From the best the Court can tell, Davis receives his revenue in the following way. For each BFBD product, there is a "standard" wholesale price that every Outlet pays. *See* Trial Tr. Vol. 3 at 530:1–3. Davis accepts product from BFBD at a discounted rate from the standard wholesale price and that discounted cost then is debited against Davis's account with BFBD. *See id.* at 568:10–22. Historically the discount rate, which is to say Davis's compensation, has always been either sixteen or eighteen percent against the wholesale price, depending on the particular product. *See id.* Vol. 1 at 91:5–22; Vol. 3 at 530:1–3; *see also* Pl.'s Ex. 5.

4

When Davis delivers the products he has received from BFBD to the Outlets in his Sales Area, instead of paying Davis directly, each Outlet generates a receivable in the amount of the wholesale price it owes for the products he delivered. *Id.* Vol. 3 at 631–32. The Outlet's receivables are then purchased from Davis by BFBD. *Id.* at 632. At times, Davis removes products from the Outlets and returns them to BFBD for various reasons. For instance, if a product goes stale, BFBD credits him for the product, which of course he could not sell. Davis earns his revenue in the form of the sixteen or eighteen percent discount BFBD gives him on its products, a rate set not by Davis, but by BFBD.[3] *Id.* BFBD claims that the only money it makes once it settles with Davis each week is the amount it charges Davis for product. *Id.* at 633–34.

This arrangement worked well enough from 2011 until February 2020 when Davis learned that Kroger, the national grocery company, had plans to construct and open an automated grocery fulfillment center indisputably in Frederick, Maryland, which is within his Sales Area ("Kroger Fulfillment Center"). But BFBD abruptly and unilaterally determined it would not allow Davis to service the Center.[4]

On or about January 29, 2023, without advising Davis, BFBD began selling and delivering its products to the Kroger Fulfilment Center via means other than Davis. Trial Tr. Vol. 1 at 163:7–

---

[3]     BFBD claims that in theory the markup can fluctuate. Davis, however, testified that since 2011 when he signed the Distribution Agreement with BFBD, the so-called "spread" percentages on his Settlement Statements have <u>always</u> been either sixteen or eighteen percent and have never changed for any of the BFBD products he sells. *See* Trial Tr. Vol. 1 at 91:5–22. BFBD has not demonstrated a single instance where the percentage of spread was not either sixteen or eighteen percent.

[4]     Apparently, although fulfillment centers have been on the scene for about twenty years, the fully automated fulfillment center is an innovation of the last five or so years. *See* Trial Tr. Vol. 4 at 682:2–9. Such automated fulfillment centers frequently deal directly with suppliers and do not function like traditional grocery stores. The Kroger Fulfillment Center, for example, is an automated warehouse facility with digital and robotic capabilities. The public, including customers, are restricted from entering. Similarly, Davis would not be able to enter the premises and do what he does in some of his other Outlets. Thus, given that the Kroger Fulfillment Center will not permit him to enter the facility, he could deliver BFBD product to the facility, but could not stock shelves, rotate and replace product, or set up promotional materials. All transactions with consumers are accomplished online.

12. BFBD takes the position that Davis does not have the right to distribute product to the Kroger Fulfillment Center because the Center is not a "retail store" that "purchase[s] Products by store door delivery." Pl.'s Ex. 3, Schedule B. It is not a "retail store," says BFBD, because it does not have "a point-of-sale check out (such as cash registers)" and because it "is not a location in which individuals purchase goods, as the public is not permitted inside." *See* ECF No. 68 at 22. BFBD further argues that the Fulfillment Center does not purchase by "store door delivery" because store door delivery encompasses much more than "merely dropping off product at a warehouse." *Id.* at 24. According to BFBD, it includes all other activities IDs take to increase sales opportunities, such as stocking shelves, rotating and replacing products, and putting up promotional material.

Davis stands his ground. He insists that he does have the exclusive right to distribute to the Kroger Fulfillment Center. He defines a "retail store" as a place of business in which merchandise is sold primarily to ultimate consumers. He submits that "store door delivery" simply involves "a product being moved to an outlet, typically by truck" that "ends . . . when the receiver receives the product." Trial Tr. Vol. 1 at 57:12–15; Vol. 2 at 258:10–14. Because the Fulfillment Center sells products to customers and because Davis can deliver BFBD products to the Fulfillment Center, he argues that the Center is an Outlet within the meaning of the Distribution Agreement.

## II.    DISCUSSION

### A.    Count I – Breach of Contract

By its terms, the Distribution Agreement is governed by and construed in accordance with the laws of Pennsylvania. Pl.'s Ex. 3 § 11.8; ECF No. 40 at 39. Accordingly, with respect to Count I (Breach of Contract), Davis must prove: (1) the existence of a contract, including its essential terms; (2) a breach of the contract; and (3) resultant damages. *Kelly v. Carman Corp.*, 229 A.3d 634, 653 (Pa. Super. Ct. 2020).

The primary goal of "contract interpretation is to ascertain the intent of the contracting parties." *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468 (Pa. 2006). When a contract's language is clear and unambiguous, "the intent of the parties is to be ascertained from the document itself." *Id.* In such circumstances, a contract's language "shall be given its commonly accepted and plain meaning." *TruServ Corp. v. Morgan's Tool & Supply Co.*, 39 A.3d 253, 260 (Pa. 2012).

Generally, courts "consult the dictionary definition of a word to determine its ordinary usage." *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Com. Union Ins. Co.*, 908 A.2d 888, 897 (Pa. 2006). However, when ambiguity exists, "parol evidence is admissible to explain or clarify or resolve the ambiguity." *Allstate*, 905 A.2d at 468.

"[A] contract is not rendered ambiguous by the mere fact that the parties do not agree upon the proper construction." *State Farm Fire & Cas. Co. v. MacDonald*, 850 A.2d 707, 710 (Pa. Super. Ct. 2004) (internal quotation marks omitted). Rather, a written contract is ambiguous only when a provision or term "is reasonably susceptible of more than one meaning." *Brosovic v. Nationwide Mut. Ins.*, 841 A.2d 1071, 1073 (Pa. Super. Ct. 2004) (internal quotation marks and citation omitted). "Any ambiguities shall be construed against the contract drafter." *Wert v. Manorcare of Carlisle PA, LLC*, 124 A.3d 1248, 1260 (Pa. 2015).

At the same time, there is an important corollary to the plain meaning/ambiguity analysis: Where over time the parties to a contract themselves have engaged in a course of dealing or a course of performance during which they have effectively given meaning to terms of the contract, the actual interpretation the parties have given the terms will have a very substantial if not dispositive impact on how the terms of the contract are to be interpreted. *See e.g., Ward v. Nat'l Geographic Soc'y*, 284 Fed. Appx. 822, 823–24 (2d Cir. 2008). There is also authority to the effect

7

that clarification of a contract term in a subsequent comparable contract, if not "confessing" that the original term means the opposite of what the amending party contended the term meant in the original contract, at least establishes the latent ambiguity of the original term, permitting recourse to parol evidence. *See Pastor v. State Farm Mutual Auto. Ins. Co.*, 487 F.3d 1042 (7th Cir. 2007) (Posner, J.).

These background principles significantly inform the Court's approach to the Parties' dispute in this case over the meaning of "Outlet," "retail store," and "store door delivery" under the Distribution Agreement. Putting aside for the moment how the Parties themselves have defined these terms over their course of dealing or course of performance, the Court accepts that the terms are otherwise sufficiently ambiguous enough to invite consideration of parol evidence.

### 1.    Retail Store

The term "retail store" is not defined in the Distribution Agreement and the Parties disagree as to its meaning. BFBD says the term is unambiguous and includes only brick and mortar retail locations that customers can enter to purchase goods at a point-of sale check out inside the building. The Court has already suggested that BFBD, by its recent amendment to its distribution agreements, belies its insistence that term has a plain meaning and parol evidence clearly cuts against BFBD's formulation. *See Pastor*, 487 F.3d at 1045 (Posner, J.).

In 2011, fulfillment centers, while not yet automated, were already coming into existence — *i.e.*, they were accepting and fulfilling online orders without customers ever entering the facilities. *See* Trial Tr. Vol. 4 at 682:2–9; Vol. 2 at 194:11–195:9. People in the grocery retail business were well aware of such fulfillment centers and already sensed that e-commerce was poised to have considerable impact on the industry. *See id.* Vol. 2 at 194:11–195:9, 307:16–308:16. From a common sense stand-point, at least, the term "retail store" as used in the Distribution

Agreement could well be understood to cover places of business that sell goods to the ultimate consumer online, with little or no entry of the consumer into the store.

Dictionary definitions do not resolve the ambiguity. Merriam-Webster's Online Dictionary defines the term "retail store" as "a place of business usually owned and operated by a retailer but sometimes owned and operated by a manufacturer or by someone other than a retailer in which merchandise is sold primarily to ultimate consumers." Pl.'s Ex. 41 at 3.[5] This definition implies that merchandise must be <u>sold</u> in a place of business for it to constitute a retail store, but in no way does it specify that customers must physically <u>buy</u> the merchandise from within the store itself. Merchandise could be sold and purchased entirely online. The Court therefore finds the term "retail store" "reasonably susceptible of more than one meaning," *Brosovic*, 841 A.2d at 1073, and turns to other evidence in the record to interpret it. *See Allstate*, 905 A.2d at 468.

Davis testified at trial that for him, as a matter of historical practice, a retail store under the Parties' Agreement refers simply to an entity that "sells product to [the final] consumer." Trial Tr. Vol. 1 at 53:19–21; Vol. 2, at 248:1–15. His definition matches the understanding of other BFBD employees who testified at trial, individuals who were working for BFBD in 2011 when Davis purchased his distribution rights. Sydney Taylor, for example, who testified he spent decades working in the grocery retail industry and worked for BFBD from 2009 through 2018, *id.* Vol. 2 at 410:14–412:4, was responsible for brokering the sale of distribution rights to IDs, *id.* at 364:9–366:18, 414:25–415:7, and was actually present when Davis purchased his distribution rights and signed his Distribution Agreement, *id.* at 415:8–13. Taylor testified that he understood as of 2011 and understands today that a "retail store" is "[a]ny retail outlet that is offering goods for purchase by a consumer for their own consumption and/or use." *Id.* at 377:23–378:6. Taylor further testified

---

[5]        Available at https://www.merriam-webster.com/dictionary/retail%20store.

that he believes that an automated grocery fulfillment center qualifies as a retail store under that definition. *See id.* at 379:4–8.

The testimony of former BFBD employees Rick Smith and Paul Wiegand further supports the proposition that in 2011, and even today, BFBD employees understood and understand that a "retail store" has meant simply a facility that sells goods to consumers. *Id.* at 329:23–330:1, 330:24–331:1, 422:24–423:4. Neither witness gave any indication that the term "retail store" would exclude locations that sell goods online or where customers are not permitted to enter the store to purchase goods.

BFBD relies almost exclusively on its expert Dr. Richard J. George, a Professor of Food Marketing from St. John's University in Philadelphia, in support of its position. Dr. George posited, notwithstanding the uniform understanding of BFBD employees Taylor, Smith, Wiegand, and Davis himself, that a "retail store" is much more than a store that sells goods to consumers:

> [I]n the food retail industry, a retail store, you think in terms of bricks and mortar, Your Honor. Things like a grocery store, a supermarket, a CVS, convenience store, even a Costco would be a store which offers products for sale, which customers can come in, into that store. And the success of the store is a function of shelving, displaying, merchandising, and everything else that goes into a person coming into a store. . . . in this particular case, [merchandising is] very relevant [to the definition of retail store] because merchandising is a way for a manufacturer, in this particular case, [BFBD], to differentiate itself on the rest of the store.

*Id.* Vol. 4 at 677:21–678:10. The problem for BFBD is that, despite Dr. George's extensive resume,[6] based on the record this simply is not how people in the industry or BFBD employees generally understand the term (nor as they understood it in 2011). This shortcoming is highlighted by Dr. George's inability, apart from his own opinion, to locate "any written authorities" to support his definition. *Id.* Vol. 4 at 775:14–776:4. BFBD's corporate designee BJ Dissinger likewise had

---

[6]    It appears that this is at least the third lawsuit in which Dr. George has appeared on behalf of BFBD. *See* ECF No. 26-16 at 23–24.

to admit that he could not point to any written source to support BFBD's definition of "retail store" as "a retail location where customers enter the store." *Id.* Vol. 3 at 525:11–17. In short, what BFBD has proposed as a definition is essentially at odds with the people it employs and conducts business with — people like Davis, Taylor, Smith, and Wiegand — and frankly appears to have been contrived primarily for the purpose of ending a contract right it is not happy to be saddled with.

Accordingly, based on all the evidence, the Court finds that the term "retail store" as used in the Distribution Agreement means a place of business that sells goods directly to the consumer. It does not exclude a retailer that takes orders from customers online or fulfills such orders from a facility without customer contact, without the customer entering a brick and mortar location. The Court specifically finds that because the Kroger Automated Fulfillment Center is a place of business that sells goods to consumers, it is a "retail store" under the Distribution Agreement.

### 2.    Store Door Delivery

BFBD argues that even if the Court finds that the Kroger Fulfillment Center to be a "retail store," it does not "purchase Products by store door delivery" and thus is not an "Outlet" under the Distribution Agreement. Pl.'s Ex. 3, Schedule B.

The Parties dispute whether the term "store door delivery" requires such activities as stocking shelves, rotating and removing product, and merchandising.[7] BFBD believes it does. *See id.* Vol. 3 at 494:4–10, 496:1–8; Vol. 4 at 679:8–13, 705:15–20. Davis, for his part, believes that "store door delivery" is "a product being moved to an outlet, typically by truck" that "ends . . . when the receiver receives the product." *Id.* Vol. 1 at 57:12–15; Vol. 2 at 258:10–14.

As with the term "retail store," "store door delivery" has no plain meaning, so resort to parol evidence is in order. And here, once again, the course of dealing and course of performance

---

[7]    Merchandising refers to putting product on a shelf, arranging it, rotating it, and ensuring it is presentable. *Id.* Vol. 1 at 81:15–20; Vol. 2 at 328:13–18; Vol. 4 at 679:21–25.

as between the parties, including the testimony of BFBD employees, militate in favor of Davis's interpretation of the term.

The 9th Edition of the Dictionary of International Trade, cited by Davis at trial, published the year before Davis signed his Agreement with BFBD, defines "store-door delivery" as "(shipping) The movement of goods to the consignee's place of business, customarily applied to movement by truck." Pl.'s Ex. 42 at 5. Food Marketing Institute ("FMI"), which Dr. George described as "the leading food retailing association in the United States," Trial Tr. Vol. 4 at 769:1–7, publishes a Food Industry Glossary. That glossary defines "direct store delivery (DSD)," which Dr. George says is another name for "store door delivery," *id.* at 736:5–8, as "[p]roducts delivered directly to a store by the vendor, such as soft drinks, beer, bread and fresh baked goods, [etc.]." Pl.'s Ex. 44 at 14. When closely examined, however, Dr. George in effect had to concede that FMI's definition of direct store delivery requires that a vendor deliver products to a store and nothing more. Trial Tr. Vol. 4 at 772:11–774:2. These dictionary definitions strongly support Davis's proposed definition.

Messrs. Taylor and Smith testified that while they were employed at BFBD, including in 2011, they understood the term "store door delivery" to mean simply delivery to a retail outlet for sale to the consumer and both agreed that, in their experience, if an ID did not stock shelves, set up advertising displays, or remove stale products, it nevertheless constituted store door delivery. Trial Tr. Vol. 2 at 374:16–375:15, 376:7–377:11, 420:20–422:4, 433:22–434:4. Wiegand similarly testified that in his experience, "store door delivery" means "serv[ing] a store or outlet directly from [a] truck to the store," *Id.* at 327:13–16, and if an ID does not stock shelves, set up advertising displays, merchandise products, or remove stale products, delivering products to a store nonetheless constitutes store door delivery. *Id.* at 327:18–330:1. More significantly, BFBD

consistently acted in accordance with this understanding. It compensated its IDs, not least Davis, notwithstanding their alleged failure to stock shelves and the like. Again, BFBD simply appears to have crafted a new melody for modern times.

Notably, Wiegand testified that he serviced a Giant Peapod Fulfillment Center from 2000 until he sold his route in 2007. *Id.* at 308:11–16. This Fulfillment Center was not automated as the Kroger Fulfillment Center is and Wiegand was able to enter the Peapod to place products on the shelves. *Id.* at 308:18–309:9. But at the same time the Peapod did not function like a traditional grocery store either, in that customers could not enter to purchase products. *Id.* at 309:11–310:16. Instead customers ordered products online and Peapod employees would select said products from the shelves to be delivered to the customer. Yet Wiegand's contract required him to deliver by "direct Store Door Delivery" and he was permitted to service the Peapod. *Id.* at 306:18–307:5, 311:18–22.

The Court is aware that Davis purchased his distribution rights from BFBD in 2011, about four years after Wiegand stopped servicing the Peapod Fulfillment Center, and that Wiegand's contract was not with BFBD, but with an entity that BFBD subsequently purchased. Nevertheless, Wiegand's testimony shows that a precursor to the Kroger automated fulfillment center existed in Davis's Sales Area prior to 2011 that was serviced by an ID even though customers did not enter a bricks and mortar location to do so. This, at a minimum, undermines any suggestion by BFBD that, when Davis signed his Distribution Agreement with BFBD, the term "store door delivery" was universally understood within the industry to exclude a facility that did not permit customers to enter to purchase goods.

As with its definition of "retail store," BFBD's go-to source is Dr. George. But once again, Dr. George had to admit that he was not able to identify any written source to buttress his

13

definition. *See id.* Vol. 3 at 525:18–526:1; Vol. 4, 739:8–741:8. In his report, Dr. George did refer

to an article entitled "Optimizing The Value Of Integrated DSD," published in 2011 by the Grocery

Manufacturers Association and Willard Bishop (the "Bishop Article").[8] *See* Pl.'s Ex. 20; *see also*

Trial Tr. Vol. 4 at 755:6–16. The Bishop Article states in relevant part:

> Fully Integrated DSD: While the acronym DSD is used broadly, the meaning can
> vary. For some it is an umbrella term covering all the product arriving at a store
> that didn't come through the retailer's own warehouse or primary wholesaler. This
> ranges from specialty foods which are typically handled by a specialized distributor
> to greeting cards that arrive via overnight shipping services. Fully Integrated DSD
> gets its additional power by combining four key elements of the supply chain:
> • Ordering • Warehousing and Delivery • Merchandising • Coordinating

Pl.'s Ex. 20 at 4. If it does anything, this language cuts in a direction opposite from Dr. George's

testimony. First, the text highlights that there is <u>not</u> a universal definition of the term direct store

delivery. In fact, the Article says "the[ir] meaning can vary." *Id.* Second, though BFBD insists that

activities such as merchandising, warehousing, and coordinating are included in store door

delivery and direct store door delivery, the Bishop Article suggests that these elements are instead

part of something with "additional power," something the Article refers to as "<u>fully integrated</u>

direct store delivery." *Id.*

Moreover, while Dr. George at one point insisted that the term "store door delivery"

requires an ID to take efforts to increase sales such as ordering product, merchandising, talking to

the store, and pulling returns, *see* Trial Tr. Vol. 4 at 679:8–13, 705:15–20, 739:8–14, at another

point he admitted that an ID need not "necessarily do all those things" for it to constitute store door

delivery. *Id.* at 759:11–16. Similarly, when asked which actions an ID <u>must</u> take for it to constitute

store door delivery, BFBD's corporate representative, Dissinger, testified that "there's not a

---

[8]     The Bishop Article refers to "Fully Integrated DSD." *See* Pl.'s Ex. 20 at 4. DSD is an acronym
for "direct store delivery." *Id.* To explain his reliance on the article, Dr. George asserted that "direct store
delivery" is interchangeable with the term "store door delivery." Trial Tr. Vol. 4 at 736:3–19.

complete list that you have to do every piece of" and "there's not a checklist to say '[if] I do this, this, this, and this; if not it's not store door.'" *Id.* Vol. 3 at 535:11–536:2. This would seem to be a conveniently malleable reading of a contract term making it possible for BFBD to cut off an ID's claim for potentially thousands of dollars whenever it decided to do so.

Underlying all this, of course, the language of the provision at issue in the Distribution Agreement itself strongly suggests that an ID need not do more than deliver product to a retail store for his conduct to constitute "store door delivery." Pursuant to Schedule B of the Distribution Agreement, an Outlet can be either a retail store, restaurant, or institutional account. *See* Pl.'s Ex. 3, Schedule B ("Outlets shall mean all retail stores restaurants and institutional accounts . . . ."). To constitute an Outlet, the retail store, restaurant, or institutional account must "purchase Products by store door delivery." *Id.* Davis does not have any restaurants in his Sales Area, but it stands to reason that if he did, he would not be stocking shelves, rotating or removing product, or setting up advertising displays. He would simply be delivering BFBD product to the restaurant. Again, Weigand, a plausible comparator even if not employed by BFBD, who serviced restaurants as an ID, testified that when he serviced such outlets, he "[j]ust dropped [the products] off." Trial Tr. Vol. 2 at 332:23–333:18, 336:8–15. Nothing more. And he got compensated.

Here, too, Dissinger, BFBD's corporate representative, had to acknowledge that while an ID might enter an institutional account or restaurant to drop off products, he would not necessarily undertake all the additional actions, such as setting up advertising material, that BFBD now claims are the sine qua non of store door delivery. *See id.* Vol. 3 at 532:22–535:4, 537:15–22. If restaurants and institutional accounts — which do not ordinarily require services beyond drop off — qualify for store door delivery within the meaning of the Distribution Agreement, why don't automated fulfillment centers?

15

Undeterred, BFBD reaches for other arrows in its quiver. If, it says, the Court were to conclude that the Kroger Fulfillment Center is an Outlet, it would annul Section 4.1 of the Distribution Agreement which states:

> In order to maximize its purchases from BFBD, [Davis] agrees to develop and maximize sales of Products to Outlets within the Sales Area by maintaining an adequate and fresh supply of Products in all Outlets; rotating Products to promote their sale before they become stale or off code; promptly removing all stale or off code Products; cooperating with BFBD or its affiliates in its marketing programs, maintaining a computer assisted record-keeping system compatible with the system maintained by BFBD now or in the future; and providing service on a basis consistent with good industry practice to all Outlets requesting service in the Sales Area.

Pl.'s Ex. 3 § 4.1.

This provision, in the Court's view, has nothing to do with whether a location qualifies as an Outlet. It is little more than an adjuration that the ID should do what he can to stimulate sales. The Parties agree that "providing service on a basis consistent with good industry practice," as required by Section 4.1 may include, at times, not taking one or more of the actions listed in that Section. Trial Tr. Vol. 1 at 43:14–18; Vol. 4 at 711:14–23. If an Outlet specifically requests that an ID not provide one or more of the services listed in Section 4.1, BFBD has never insisted that an ID must ignore that request in order to comply with the Section or, if the ID would not or could not do so, that he would be taken off the account.

The Court concludes that an ID need not take all actions listed in Section 4.1 in order to effectuate "store door delivery" or to fulfill his obligations under Section 4.1. *See id.* Vol. 4 at 711:14–23, 759:11–16. Section 4.1 is not nullified just because the Kroger Fulfillment Center, or any other Outlet in Davis's Sales Area, will not allow Davis to provide the services listed.

All this to say that, far from BFBD's recently contrived position that the term "store door delivery" unambiguously excludes facilities that an ID cannot enter or perform ancillary services

16

in-store, the Parties' course of dealing and course of performance confirm Davis's position that the term means exactly what it says — delivery to the store and no more. The Court therefore adopts the following definition of the term. "Store door delivery" means the delivery of goods directly to a store by a vendor. Activities such as stocking shelves, rotating and removing product, and merchandising, are not required for an ID to engage in "store door delivery." The Court further finds that since Davis is fully capable of delivering goods directly to it, the Kroger Fulfillment Center "purchases Products by store door delivery," within the meaning of the Distribution Agreement.

The Kroger Fulfillment Center in Frederick, Maryland is a "retail store" that "purchases [p]roducts by store door delivery." It is an "Outlet" as defined by the Distribution Agreement and Davis has the exclusive right to service it. BFBD has denied him that right and has thus breached the Parties' Distribution Agreement.

The Court turns to remedy.

### 3.    Injunctive Relief

As one of his requests for relief, Davis seeks an injunction requiring BFBD to recognize his Distribution Rights with respect to the Kroger Fulfillment Center and enjoin BFBD from servicing the Kroger Fulfillment Center by or through any other method, distributor, or employee. In other words, Davis apparently wants to do the servicing himself. As set forth in the Court's discussion of Davis's request for Declaratory Relief, *see infra* Part II.B, it will declare that Davis (or his assignee) has the right to service any automated fulfillment center in his Sales Area (including but not limited to the Kroger Fulfillment Center), but the Court will not order that Davis and only Davis be the servicer. The Court believes such an injunction would impede the desire of the Kroger Fulfillment Center to operate and develop the way it would like and would impose a

relationship that the Fulfillment Center simply may not be interested in pursuing. Moreover, the likelihood is high that such a relationship with BFBD, if forced, would require future monitoring and intervention by the Court, which in and of itself is a sufficient reason to deny that aspect of the relief Davis requests. *See Lord & Taylor, LLC v. White Flint, LP*, 780 F.3d 211, 219 (4th Cir. 2015). But this is not the same thing as saying BFBD does not have and will not have the obligation to compensate Davis for the lost opportunity to service the Kroger Fulfillment Center. BFBD will have to do so now (and in connection with any other fulfillment center). That is the price BFBD has to pay Davis for breaching its 2011 contract with him.

### 4.    Past and Future Lost Revenue / "Lost Profits"

The Court turns to Davis's alternative claim for money damages. He seeks to recover: (1) his lost revenue arising from BFBD's breach of the Agreement as of the date of the judgment; (2) his anticipated future lost revenue arising from BFBD's breach of the Agreement over a period of fifteen years;[9] and (3) the decreased potential sale value of Davis's distribution rights. *See* ECF No. 40 at 26.

The Court begins with the request for past and future lost revenue. Here, BFBD throws up a barricade that, to be fair, demands close attention. The Distribution Agreement states: "Notwithstanding anything to the contrary contained in this Agreement, in no event shall either party be liable to the other for any consequential, incidental, indirect or special damages, including lost profits and punitive damages." Pl.'s Ex. 3 § 11.12. BFBD relies on this clause to argue that Davis may not recover any lost revenue he seeks because, pursuant to Section 11.12 of the Distribution Agreement, he waived his right to recover any damages for lost profits. Davis

---

[9]     Davis believes fifteen years is a conservative estimate of the life of the Kroger Fulfillment Center. ECF No. 40 at 26.

meanwhile acknowledges that, while Section 11.12 may bar "lost profits" if they are consequential, incidental, indirect, or special damages, he can recover lost profits, which is to say, lost revenue, insofar as they are <u>direct</u> damages. The Court agrees with Davis.

In 2016, Judge Earl Britt of the United States District Court of the Eastern District of North Carolina addressed similar arguments regarding an identical contractual provision in another case against BFBD. *See Martin v. Bimbo Foods Bakeries Distrib., Inc.*, 5:14-cv-17-BR, 2016 WL 5173249 (E.D.N.C. Sept. 21, 2016).[10] The plaintiff in *Martin* sought to recover the "profits" he lost upon BFBD's termination of his distribution route. Citing language identical to Section 11.12 of Davis's Agreement, BFBD argued in *Martin*, as it does here, that the agreement between the parties barred recovery of all "lost profits." *See id.* at *1. Judge Britt disagreed, reasoning as follows:

> The provision's meaning is plain. It prohibits several categories of damages, namely, consequential, incidental, indirect, and special. It then provides lost profits as an example. However, that does not mean *all* lost profits are barred. It is the recovery of lost profits which are considered consequential, incidental, indirect, or special damages that is precluded.

*Id.* at *2. Judge Britt further found that under Pennsylvania law, "lost profits can be, depending on the circumstances, direct (general) damages or indirect (consequential) damages." *Id.* He then considered how to categorize the plaintiff's alleged profits:

> The difference between direct and consequential damages depends on whether the damages represent (1) a loss in value of the other party's performance, in which case the damages are direct, or (2) collateral losses following the breach, in which case the damages are consequential. *See, e.g.*, Restatement (Second) of Contracts § 347 cmt. c (1981). As the Second Circuit has explained, lost profits are consequential damages when, as a result of the breach, the nonbreaching party suffers loss of profits on collateral business arrangements.

*Id.* at *2–3 (quotation marks and alternations in original omitted).

---

[10]     As is the case here, the agreement at issue in *Martin* was governed by Pennsylvania law. *See id.* at *1, n. 1.

In *Martin*, as here, the plaintiff's income was based on "margin" — the difference between the price BFBD charged the plaintiff for the bakery products (less credit for any returned products) and the amount defendant paid plaintiff for receivables, *i.e.*, the amounts owed by grocery stores to BFBD for bakery products sold. *Id.* at *3. Under that payment structure, Judge Britt found that the plaintiff had no contracts or independent arrangements with the grocery stores and that the profits he lost were derived from the contract with BFBD itself, and, therefore, direct damages were not precluded by the limitation of liability provision in the distribution agreement. *Id.*

The Court agrees with Judge Britt's reasoning in *Martin* and applies it here.[11] As in *Martin*, Davis's Distribution Agreement does not bar all lost profits; only lost profits that are consequential, incidental, indirect, or special. Davis seeks the past and future revenue he could have earned if BFBD had allowed him to service the Kroger Fulfillment Center. Accordingly, the Court finds that the "lost profits," *i.e.*, the lost revenue Davis seeks are not barred by Section 11.12 of the Distribution Agreement because they are direct damages. *See* Pl.'s Ex. 3 § 11.12.

Though BFBD argues that, under its arrangement with Davis, Davis owns the products he buys from BFBD and earns a "profit" by reselling them to third parties separately, the relationship of the Parties, as the Court has suggested from the outset, is not that simple; Davis is not as independent as BFBD implies. He has no direct contracts or independent arrangements with the grocery stores he delivers to, and the grocery stores do not pay him directly. Instead, each grocery store gives Davis receivables for the BFBD products Davis delivers to it that Davis must then take back to BFBD so that BFBD can determine how much it owes Davis for the products he delivered. *See supra* Part I. Moreover, Davis does not set his "profit" margin, BFBD does. *See* Trial Tr. Vol. 3 at 529:22–530:7, 577:4–9. Thus, while there may be some features of the Parties' relationship

---

[11]    It appears that this litigation was eventually settled. *See Martin*, 2016 WL 5173249, ECF No. 192.

that look like independence, Davis in many respects functions much like an agent for BFBD. The "profits," which is to say the revenue, he has lost and will continue to lose on the Distribution Agreement itself are the direct consequence of BFBD using other means to service the Kroger Fulfillment Center. The Court finds Davis is entitled to damages for lost revenue, even if nominally referred to as "lost profits."[12]

Davis also submits he is entitled to damages because BFBD has decreased the overall resale value of his distribution rights by excluding the Kroger Fulfillment Center from his entitlement. The Court, however, finds that any alleged diminution in market value of his contract is a consequential damage, as to which, in Section 11.12 of the Agreement, Davis waived any claim. *See Ada Liss Grp. (2003) v. Sara Lee Corp.*, No. 1:06CV610, 2009 WL 3241821, at *8 (M.D.N.C. Sept. 30, 2009) ("North Carolina courts as well as courts in other jurisdictions overwhelmingly categorize diminution in value as a 'consequential' damage."); *see also* Pl.'s Ex. 3 § 11.12. The Court therefore awards no damages for lost resale value, only for revenue lost on his Agreement with BFBD.[13]

---

[12]    Because the Court finds that Section 11.12 of the Distribution Agreement does not bar Davis from recovering the damages he seeks, it need not reach his argument that the provision, if found to bar such damages, is unconscionable.

[13]    An important distinction would seem to be in order at this point. Although Davis has waived any claim to the diminished resale value of his Agreement, all that means is that he cannot recover damages for the loss from BFBD. But that does not mean that the Agreement no longer has resale value. Since the Parties agree that Davis can assign his rights under the contract (there is apparently no time limit), *see* Pl.'s Ex. 3 § 6.1, Davis may well be able to assign, which is to say, sell his contract rights to an assignee (family member or otherwise) and the assignee could then insist that BFBD render to him the same arrangements and benefits that are found to be due and owing to Davis while the right to service the Kroger Fulfillment Center — at least for the next fifteen years — is off the table by reason of the damages award in this case, BFBD would still be bound to respect the assignee's rights to service any other automated fulfillment center in Davis's Sales Area. For present purposes, however, it is just a matter of saying that BFBD cannot be held liable for the resale value of the Distribution Rights.

### 5.    Damages

As a result of BFBD's breach of contract Davis has lost the opportunity to obtain products from BFBD to deliver to the Kroger Fulfillment Center. He thus has lost out and will continue to lose out on revenue that he should have been able to earn under the Agreement.

How much has he lost?

The Court begins with January 29, 2023, when BFBD began selling and delivering its products to the Kroger Fulfilment Center via means other than Davis. Trial Tr. Vol. 1 at 163:7–12. Data provided by BFBD show that from approximately January 29, 2023, through September 30, 2023, BFBD sold a total of $118,270.85 worth of products to the Kroger Fulfillment Center. Pl.'s Exs. 13, 14, 47; *see also* Trial Tr. Vol. 1 at 145:11–148:15.[14]

Davis submits that, had he been permitted to deliver products to the Kroger Fulfillment Center from January 29, 2023, to September 30, 2023, he would have earned $20,405.99. *See* Trial Tr. Vol. 1 at 152:15–154:25; Pl.'s Exs. 13, 14, 47. His exhibits show that the "delivered price" in BFBD's sales data represents the wholesale price the Kroger Fulfillment Center paid BFBD for each product and affirms, based on Davis's historical experience, that he is entitled to sixteen or eighteen percent (depending on his percentage spread for that product) of the wholesale price. *See* Trial Tr. Vol. 1 at 152:15–154:25; Pl.'s Exs. 13, 14, 47. To calculate his lost revenue for each product BFBD sold to the Fulfillment Center, Davis has multiplied the number of units sold at the "delivered price" to determine a "total delivered price," and has then multiplied the "total delivered price" by the applicable percentage spread listed for each product on his Settlement Statement. *See*

---

[14]    BFBD has objected to the authenticity of Plaintiff's Exhibit 47, which consolidates the data in Plaintiff's Exhibits 13 and 14 for the purpose of calculating his lost revenue. Trial Tr. Vol. 1 at 152:5–19. The Court finds that Davis's testimony fairly collects the data and supports a finding of authenticity. *Id.* at 153:22–25, 159:13–163:16.

Pl.'s Exs. 5, 13, 14, 47. The Court finds this to be a reasonable method by which to calculate Davis's lost revenue from January 29, 2023, to September 30, 2023.

First, presumably on the assumption that it had an iron lock on the liability issue in the case, BFBD disdained to present much counter evidence with respect to Davis's claim of damages, including, as will be noted presently, giving non-responsive answers to some questions posed by the Court.

Beyond that, it is reasonable to infer, as Davis has, that in BFBD's sales data, the column entitled "Delivered Price" lists the price the Kroger Fulfillment Center paid BFBD for each product delivered to it. *See* Pl.'s Ex. 13 at 1. This inference is fortified by comparing the "Delivered Price" in BFBD's sales data to the "Cust Inv Price" (presumably Customer Invoice Price) in the "Promotion and Discount Allowances" section of Davis's Settlement Statement.[15] *See* Pl.'s Ex. 5 at 6–10.

The Court has identified several products listed on Davis's Settlement Statement that appear in BFBD's Kroger Fulfillment Center sales data. It notes that for each of those products, the "Delivered Price" the Fulfillment Center paid matches the "Cust Inv Price" on Davis's Settlement Statement. A fair representative sampling indicates that both the "delivered price" and the "Cust Inv Price" for: (1) "EM BLUEBERRY 6P" was $4.02, Pl.'s Ex. 5 at 6; Pl.'s Ex. 13 at 4;

---

[15]     BFBD sometimes provides Outlets with discounts on certain products to encourage sales. The "Promotion and Discount Allowances" section of Davis's Settlement Statement calculates the amount BFBD must credit back to Davis for the products it charged the Outlets a discounted rate for to ensure Davis earns the correct revenue share (his sixteen or eighteen percent margin) for each Product. *See id.* To determine the credit due to Davis based on its discounts, it appears that BFBD takes the wholesale price for a given product, or the "Cust Inv Price," subtracts from that the price the Outlet was charged under the discount, or the "Invoice Price," then takes 84% or 82% of that difference to determine the value of the "Unit/Allow" column. *See id.* BFBD then multiplies the "Unit/Allow" value by the number of units sold to determine the value in the "Allow" column. The sum of all the entries in the "Allow" column is what BFBD credits Davis in the line item titled "Promo/Disc Credit Allow" on the first page of his Settlement Statement. *See id.* at 1.

(2) "SL DEL HMG RT" was $3.71, Pl.'s Ex. 5 at 6; Pl.'s Ex. 13 at 4; (3) "BP WHI HOTS 8P"

was $2.97, Pl.'s Ex. 5 at 6; Pl.'s Ex. 13 at 2; (4) "BP WHI HAMS" was $2.97, Pl.'s Ex. 5 at 6;

Pl.'s Ex. 13 at 3; (5) "SL BUTTER ST" was $3.03, Pl.'s Ex. 5 at 6; Pl.'s Ex. 13 at 4; (6) "PLAIN

BGL 6P20" was $4.17, Pl.'s Ex. 5 at 7; Pl.'s Ex. 13 at 4; (7) "SL DEL WHIWG" was $3.25, Pl.'s

Ex. 5 at 7; Pl.'s Ex. 13 at 3; (8) "BP EVRY HAM" was $3.33, Pl.'s Ex. 5 at 7; Pl.'s Ex. 13 at 3;

(9) "AR KETO BRD" was $5.69, Pl.'s Ex. 5 at 7; Pl.'s Ex. 13 at 2; and so on. These exhibits

indicate that both the "Delivered Price" (in BFBD's sales data) and the "Cust Inv Price" (on

Davis's Settlement Statement) represent the wholesale price BFBD charges the Outlets for its

products,[16] and further, that that price is standardized for each product across Outlets. The latter

point is corroborated by the testimony of BFBD's corporate representative. *See* Trial Tr. Vol. 3 at

530:1–3.

BFBD takes issue with the fact that Davis has used his Settlement Statement to determine

what his percentage spread would have been for each Product BFBD sold to Kroger because,

according to BFBD, Davis has no idea if Kroger would agree to such spreads. To the contrary,

however, historical experience provides an apt guide. The Court notes again that Davis testified

that, since 2011 when he signed the Distribution Agreement with BFBD, the "spread" percentages

on his Settlement Statements have <u>always</u> been either sixteen or eighteen percent and have never

changed for any of the BFBD products he sells. *See id.* Vol. 1 at 91:5–22. BFBD has not pointed

---

[16]     This conclusion is supported by the fact that, if one starts with the "Cust Inv Price" (or the
wholesale price) of a product, multiplies it by the "Spread %" for that product, then subtracts that result
from the "Cust Inv Price", the result is the "Cost" listed in the "Final Load Charge" portion of the
Settlement Statement. *See* Pl.'s Ex. 5 at 2, 6. Davis testified that the "Cost" column refers to the price
BFBD debits him for the product. Trial Tr. Vol. 1 at 90:14–18. For purposes of illustration: Item 000592
AR HLTHY has a "Cust Inv Price" (wholesale price) of $4.02. The "Spread" is 18%. $4.02 multiplied by
18% equals 0.7236, and $4.02 minus 0.7236 equals the "Cost" listed for AR HLTHY in the "Final Load
Charge" section, or $3.2964. *See* Pl.'s Ex. 5 at 2, 6.

to a single instance where the "spread" percentage was not either sixteen or eighteen percent. Perhaps more importantly, as stated above, the sales data BFBD provided indicate that from January 29, 2023, through September 30, 2023, Kroger was in fact willing to pay the same wholesale price that all of Davis's other Outlets pay.[17] The Court has seen no evidence that Kroger, or any other Outlet for that matter, has any influence at all on the spread Davis earns. That Kroger is willing to pay the "standard" wholesale price in fact indicates just the opposite — that BFBD sets the spread independently and works backwards from the wholesale price the retailer pays to determine what to charge Davis. This conclusion is supported by other evidence. *See id.* Vol. 3 at 529:22–530:7, 577:4–9. The Court therefore is confident it has all the information it needs to calculate Davis's lost revenue and has no problem using the percentage spreads from Davis's Settlement Statement — the same spreads he has earned consistently for thirteen years. The Court adopts Davis's method of calculation and finds that from January 29, 2023, to September 30, 2023, his lost revenue amounts to $20,405.99.

Since Davis would have made that $20,405.99 in revenue over a period of 245 days, that equates with $83.2898 a day. How far in the future will the losses extend? Damages are ordinarily recoverable for the term of the contract, but Davis's contract does not have a termination date. The Court will therefore award Davis lost revenue for a period of time that may be projected with reasonable certainty. *See Palmer v. Connecticut Ry. & Lighting Co.*, 311 U.S. 544, 561–62 (1941). How long might that be?

Davis asks for a window of fifteen years in the future. A number of considerations come to mind. Davis is sixty-four years old. Trial Tr. Vol. 1 at 21:17–21. He has been in the food

---

[17]    While Kroger may not be saving money by dealing directly with BFBD, it certainly does not go unnoticed that BFBD appears to have increased its take considerably by cutting Davis out of the transaction: BFBD now gets the wholesale price from Kroger instead of the discounted price it would have to give Davis.

distribution business for over forty years. *Id.* at 37:16–18, 39:11–14. Taking judicial notice of his life expectancy as a white male of sixty-four years to be 17.63 years,[18] Davis could arguably remain active until eighty years of age, which is to say for fifteen more years. Numerous articles report Americans working into their eighties, including a President and a prominent actor or two going on for that long.[19] And the Distribution Agreement does not specify that Davis himself must service each Outlet, so even if he could not personally service the Fulfillment Center for that period of time, he could still earn revenue, as he suggests, by having his wife or a child fill in for him. Trial Tr. Vol. 1 at 21:22–22:15.

As for Kroger, it has been around since 1883 with an ever-increasing stable of food distribution facilities.[20] *See* ECF No. 68-1 at 5–6; Def.'s Exs. 6, 7, 8. And automated fulfillment centers, not just for groceries, are unquestionably the wave of the future, here to stay and multiplying with acceleration. *See id; see also* Alexis Mizell-Pleasant, *A Quiet Revolution: The Future of Warehouse Automation*, SUPPLY & DEMAND CHAIN EXECUTIVE, Sept. 7, 2023.[21]

Accordingly, the Court finds it reasonably certain that Davis's revenue from the lost Kroger opportunity can be projected for fifteen years. Based on Davis's per diem revenue rate as calculated

---

[18]   Actuarial Life Table, Social Security Administration, https://www.ssa.gov/oact/STATS/table4c6.html.

[19]   *See* Callum Borchers, *Why High-Powered People Are Working in Their 80s*, THE WALL STREET JOURNAL, June 25, 2023, https://www.wsj.com/articles/the-reasons-more-people-are-working-in-their-80s-34f11699; Annie Nova, *As Biden faces questions about his age, researchers weigh in on working in your 80s*, CNBC, Mar. 10, 2024, https://www.cnbc.com/2024/03/10/heres-what-researchers-have-to-say-about-working-in-your-80s.html.

[20]   Since March 2021, Kroger has opened several automated fulfillment centers across the country, including locations in Ohio, Florida, Georgia, Texas, California, North Carolina, Maryland, Michigan, and Arizona. *See* Ocado Group, *Our partnership with Kroger, https://ocadogroup.com/our-business/osp-partners/kroger/.*

[21]   Available at: https://www.sdcexec.com/warehousing/automation/article/22871949/a-quiet-revolution-the-future-of-warehouse-automation.

above, the Court therefore finds that over fifteen years Davis could have made $456,011.655 in revenue ($83.2898 x 365 days x 15 years).

Against that revenue, Davis testified that servicing the Kroger Fulfillment Center would add a mile of driving to his route per day. *See id.* Vol. 1 at 165:2–21. The IRS' standard mileage rate for 2024 is $0.67 per mile.[22] Davis therefore would have spent $3,668.25 over fifteen years on additional fuel ($0.67 x 365 days x 15 years). The Court subtracts that expense from his expected revenue. Davis testified that none of his other expenses would have increased had he been permitted to service the Kroger Fulfillment Center. *See id.* at 165:16–21. Notably, BFBD presented no evidence to contradict that testimony.

The Court therefore finds Davis is entitled to $452,343.41 ($456,011.655 - $3,668.25) in lost revenue.

In conclusion, while BFBD has not argued that Davis's award must be reduced to its present value, Pennsylvania law does not in any event mandate reduction. *See Kaczkowski v. Bolubasz*, 421 A.2d 1027, 1038–39 (Pa. 1980) (directing that the award for lost future earnings was not to be discounted to present value because, as a matter of law, the future inflation rate was presumed to offset totally the future interest rate); *see also Helpin v. Trustees of Univ. of Pa.*, 10 A.3d 267, 274 (Pa. 2010) (reaffirming the reasoning in *Kaczkowski* and applying the "total offset" approach in a new context). Given that Pennsylvania law does not mandate a reduction to present value and that BFBD has made no argument that the rule established in *Kaczkowski* should not

---

[22]    IRS, *IRS issues standard mileage rates for 2024; mileage rate increases to 67 cents a mile, up 1.5 cents from 2023*, https://www.irs.gov/newsroom/irs-issues-standard-mileage-rates-for-2024-mileage-rate-increases-to-67-cents-a-mile-up-1-point-5-cents-from-2023.

While the Court recognizes that the price of fuel may increase over time, with inflation Davis's revenue is also likely to increase. The Court thus assumes that any increase in fuel costs would be approximately offset.

apply or that any damages awarded to Davis should be reduced, the Court need not calculate the present value of Davis's estimated future lost revenue.

While the Court may not have achieved mathematical exactness in this calculation, it notes that such precision is not required. While breach of contract damages should not be based on speculation, courts are able to fairly estimate them from the evidence, even absent mathematical certainty. *Kivett v. Neolpharma, Inc.*, No. 2:20-cv-00664-JDW, 2022 WL 1185885, at *6 (E.D. Pa. Apr. 21, 2022); *see also James Corp. v. North Allegheny School Dist.*, 938 A.2d 474, 494–95 (Pa. Commw. Ct. 2007) ("[T]he law does not require that proof of damages must conform to the standard of mathematical exactness."); *Jones & Laughlin Steel Corporation v. Pfeifer,* 462 U.S. 523, 546, (1983) ("[B]y its very nature the calculation of an award for lost earnings must be a rough approximation."). "The law simply requires the claim be supported by a reasonable basis for the calculation." *James Corp.*, 938 A.2d at 494. "[I]f the facts afford a reasonably fair basis for calculating how much plaintiff [is] entitled to, such evidence cannot be regarded as legally insufficient to support a claim for compensation." *Id.* at 495 (citing *Kaczkowski v. Bolubasz*, 421 A.2d 1027, 1030 (Pa. 1980)). In the Court's view, Davis has presented evidence that satisfies that burden.

Finally, the Court is obliged to note that at least some lack of mathematical certainty must be attributed to BFBD's position in the case. BFBD, in possession of all the information needed to fine tune Davis's damage claim, in many respects declined to point out or correct any specific errors in Davis's calculations, including any explanation that might shed light on what seemed to be the opaque and convoluted payment structure with IDs it operates under. On occasion BFBD failed to respond to a direct inquiry from the Court, such as when the Court requested that BFBD explain how BFBD calculates the Promotion and Discount Allowances in Davis's Settlement

Statement or that it identify what the values in each of the columns in that portion of the Settlement Statement represent. *See* ECF No. 68-2 at 2–3. Even so, the Court is confident that its damages calculation is as solid as the law requires it to be.

**B.      Count III – Declaratory Relief**

With respect to Count III[23] (Declaratory Judgment), Davis seeks judgment pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Kroger Fulfillment Center constitutes an "Outlet" over which Davis has exclusive distribution rights under the Distribution Agreement.

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon filing of an appropriate pleading, may declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. Three criteria must be met before the Court may exercise jurisdiction over a declaratory judgment action: (1) the complaint must allege an "actual controversy" between the parties "of sufficient immediacy and reality to warrant issuance of a declaratory judgment;" (2) the court [must] possess an independent basis for jurisdiction over the parties (*e.g.*, federal question or diversity jurisdiction); and (3) the court must not abuse its discretion in its exercise of jurisdiction. *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 592 (4th Cir. 2004). All three criteria are met here. An actual controversy exists between Davis and BFBD, as Parties to the Distribution Agreement, over whether the Kroger Fulfillment Center is an "Outlet" (or other automated grocery fulfillment centers in Davis's Sales

---

[23]      Davis originally brought a claim for Anticipatory Breach of Contract as Count II of his Complaint but dropped that claim once the Kroger Fulfillment Center became operational and BFBD began selling and delivering products to it. *See* ECF No. 40 at 24.

Area would be "Outlets") as defined by the Distribution Agreement. The Court possesses diversity jurisdiction over this controversy, and no good reason exists to decline exercise of jurisdiction.

All the factual and legal discussion of Davis's Breach of Contract claim clearly inform the Court's decision to enter a Declaratory Judgment in favor of Davis, with, however, a few significant exceptions as to remedy.

Accordingly, it will be **ADJUDGED, ORDERED AND DECREED** as follows.

1) The Kroger Automated Fulfillment Center in Frederick, Maryland is an "Outlet" and a "retail store" which purchases products by "store door delivery," within the meaning of the Parties' Distribution Agreement.

2) "Store door delivery" means delivery of BFBD's product to a store in Davis's Sales Area, which covers Frederick, Maryland. It may include, but does not require, in-store services such as stocking shelves, rotating product, setting up promotional material or the like. It does not matter whether the store offers in whole or part online services to consumers or whether they (or Davis) are prohibited from entering the store.

3) This means that, under Davis's Agreement, any grocery fulfillment center, automated or otherwise, in Davis's Sales Area is bound in identical fashion as is the Kroger Automated Fulfillment Center.

4) The Court declines to enjoin BFBD to permit Davis personally to service the Kroger Fulfillment Center and, while it takes no position at this time as to whether Davis should be permitted to service any other covered automated grocery fulfillment center in his Sales Area, he would otherwise be entitled to money damages from BFBD in substantially the same way as he is being awarded in this proceeding, if he is not in fact personally permitted to service such fulfillment center.

30

5) While Davis is not entitled to damages for the resale value of the Kroger opportunity, *i.e.*, BFBD is not liable to him for damages for such value, still, Davis remains free to assign his contract rights (and may do so at any price he may negotiate) and the assignee of Davis's rights shall have the same rights and entitlements vis-à-vis any automated grocery fulfillment center in Davis's Sales Area as Davis would have, including entitlement to any lost revenue should BFBD and/or the automated fulfillment center preclude the assignee from personally servicing the center.

## III.  CONCLUSION

Accordingly, Judgment on Count I (Breach of Contract) will be **ENTERED** in favor of Davis and against BFBD in the amount of $452,343.41, plus court costs.[24] Judgment on Count III (Declaratory Judgment) is **ENTERED** in favor of Davis and it is hereby **ADJUDGED, ORDERED AND DECREED** that the Kroger Fulfillment Center is an "Outlet" and "retail store" that purchases products by "store door delivery" over which Davis has exclusive distribution rights under the Distribution Agreement and, further, these definitions shall also apply to any other automated fulfillment center which operates in Davis's Sales Area.

A separate Order will **ISSUE**.

June  25 , 2024

_____
**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

---

[24]    Davis has also prayed for attorneys' fees, but, absent a contractual provision for the same, there is no basis upon which such fees can be awarded.

31